CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK: PART D
------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

                                                          AFFIRMATION IN SUPPORT OF
    -against-                                            OMNIBUS MOTION

                                                            DKT # 2013NY050589

HELEEN MEES,
       Defendant.
------------------------------------------------------------X

IRA D. LONDON, an attorney licensed to practice in the State of New York, does hereby affirm to be true under penalties of perjury:

That he is counsel for the defendant in the captioned case; that he is fully familiar with all matters set forth herein, and that this affirmation is made in support of the defendant HELEEN MEES' Omnibus Motion, notice of which is appended hereto.

I.      DEMAND FOR DISCOVERY

Pursuant to §§240.20 and 240.80 of the C.P.L. defendant demands that the property listed below be disclosed and made available to defense counsel for inspection, photographing; copying or testing within 15 days of your receipt of this demand:

1. Any written, recorded or oral statement of the defendant made, other than in the course of the criminal transaction, to a public servant engaged in law enforcement activity or to a person then acting under his direction or in cooperation with him, including:

    a. All recordings and written transcriptions, summaries and synopses of defendant's oral statements prepared by such public servants or others claiming to have heard such oral statements;

    b. Copies of all documents in the possession of such public servants bearing the signature, initials or other mark of the defendant;

    c. Any such statement which the prosecution intends to use solely for impeachment or rebuttal. People v. Barrie, 74 A.D.2d 576.

2. Any written report or document, or portion thereof, concerning a physical or mental examination, or scientific test or experiment, relating to the criminal action or proceeding which was made by, or at the request or direction of a public servant engaged in law enforcement activity; or which was made by

a person whom the prosecutor intends to call as a witness at trial, or which the People intend to introduce at trial;

3. Any other property obtained from the defendant. The defendant demands the opportunity to physically inspect such property and further demands that your disclosures in this category include:

   a. A listing of such items;

   b. Whether each item is alleged to have been obtained from the actual or constructive possession of the defendant and if the former, a description of the place from which taken;

   c. The identity of the person or persons who obtained each such item of property;

   d. The date, time and place at which the property was obtained;

   e. Whether each such item of property was obtained through the execution of a search warrant, and if so, a copy of the warrant and all requests or applications for the said warrant along with their supporting documents, and all returns on said warrant.

4. Any tapes or other electronic recordings which the prosecutor intends to introduce at trial, irrespective of whether such recording was made during the course of the criminal transaction;

5. Anything required to be disclosed, prior to trial, to the defendant by the prosecutor, pursuant to the Constitutions of the United States and the State of New York, including but not limited to:

   a. All prior statements of any witness and/or complainant (hereafter "witness") to the alleged incident(s) which are:

      i. Inconsistent with a position the witness has taken in the past or presently holds as to any aspect of the alleged incident People v. Carrion, 54 AD.2d 884 (1st Dept 1976).

      ii. Inconsistent with the factual account of any other witness. People v. Simmons, 36 N.Y.2d 126 (1976).

   b. A list of all witness(es) with date(s), time(s), and place(s);

   c. All relevant information necessary to determine whether any prosecution witness has ever been or is currently an unlawful resident of the United States of America;

2

    d.    The prior criminal record of each prosecution witness, including all known domestic and international arrests regardless of disposition. See <u>Davis v. Alaska</u>, 415 U.S. 308 (1976);

    e.    A complete list of all known prior bad acts of each prosecution witness;

    f.    A list of all prosecution witnesses who have ever had or who are currently suffering from any illness, birth defect, attention deficiency, infirmity or mental problem:

        i.    Of the mind or brain that has affected or altered his normal mental functioning or memory. <u>People v. Parks</u>, 41 N.Y. 2d 26 (1976);

        ii.    Of the eye or ear that has affected his ability to perceive with either sense. <u>People v. Woodbery</u>, 56 A.D.2d 613 (2nd Dept 1977);

        iii.    That has affected his normal emotional stability and health. <u>People v. Maynard</u>, 80 Misc. 2d 279 (N.Y. Co. 1974); <u>People v. Lowe</u>, 96 Misc. 2d 33 (N.Y.Co. 1978);

        iv.    Arising from the use of alcohol;

        v.    Arising from the use of authorized or unauthorized drugs. <u>People v. Freeland</u>, 36 N.Y.2d 525 (1975);

        vi.    That has caused the witness at anytime to seek psychiatric, psychological or emotional counseling or therapy. <u>People v. Rensing</u>, 14 N.Y.2d 210, 213 (1964).

    g.    A list of all prosecution witnesses who have ever been dependent upon, addicted to, or a constant present user of

        i.    Alcohol, or

        ii.    Any drug. See <u>People v. Freeland, supra</u>.

    j.    A list of all prosecution witnesses to whom the District Attorney and/or any law enforcement agency has:

        i.    Made any promise to the witness as to any aspect of his own past; present or future criminal cases in return for his cooperation in this investigation and trial <u>People v. Cwikla</u>, 46 N.Y. 2d 434;

      ii.    Had any conversations with the witness about potential benefits he might receive in his own past, present or future criminal cases for his cooperation in this investigation and trial;

      iii.   Declined to notify any local, state, federal or international government agency of any apparent violation of law by the witness (e.g. Immigration, Welfare, IRS, etc.);

      iv.   Made promises to provide any civil benefit of any sort (including anonymity or police protection) to induce the witness cooperation.

k.    Any other information not covered in previous requests currently in the possession of the police department, and/or the Office of the District Attorney (including prior inconsistent statements) which when viewed from the point of view of the defendant either:

      i.    Supports or is consistent with her innocence;

      ii.   Is inconsistent with her guilt as to any count or lesser included offense in this information;

      iii.  Supports or is consistent with any claim that the defendant's rights under the State or Federal constitution have been violated;

      iv.  Notifying the defense in the event of the death, disappearance or serious illness of any witness whose testimony is reasonably necessary to the prosecution of the case;

l.    Any e–mails or other social media communications between Willem Buiter and Helen Mees or relating to them in the possession or control of the District Attorney, whether in English, or Dutch, and any translations thereof.

Defendant therefore moves for an ORDER pursuant to C.P.L. Section 240.40 directing the prosecutor to disclose the material listed in the Demand. In the event that the prosecutor fails or refuses to comply with the demand within 15 days of the service of this motion, a motion to preclude will be filed.

Also pursuant to C.P.L. Section 240.40, defendant moves for an order directing the prosecutor to disclose the following additional matters to the defendant:

1.    WITNESSES: A list of the names, addresses and birth date(s) of all known witnesses, including police officers (with shield numbers and commands) to:

    a.    The alleged crime;

4

        b.        The arrest of the defendant;

        c.        The making of any statement by the defendant to any law enforcement officer or agent;

        d.        Any search of the defendant.

2. STATEMENT OF WITNESSES:

        a.        Copies of all statements made to any law enforcement officer or agent by any of the person described as a witness in (a) above.

3. POLICE REPORTS:

        a.        Copies of all New York City Police Department forms, reports, and documents prepared in connection with this case;

        b.        All of the above property described in this discovery motion is within the custody and control of the prosecutor or readily available to him; little or none of it can be obtained by the defendant through means other than this motion;

Therefore, the defendant submits these requests, which are reasonable within the meaning of C.P.L. Section 240.40.

## II.   MOTION TO DISMISS IN THE INTEREST OF JUSTICE

The defendant moves to dismiss this action in the interest of justice. The defendant is charged with (1) Menacing in the Second Degree in violation of Penal Law Section 120.14(2); (2) Stalking in the Third Degree in violation of Penal Law Section 120.50(3); (3) Aggravated Harassment in the Second Degree in violation of 240.30(1)(a); (4) Stalking in the Fourth Degree in violation of Penal Law Section 120.45(2); and (5) Harassment in the Second Degree in violation of Penal Law Section 240.26(3).

Regarding Count One, the amended complaint states that Ms. Mees "repeatedly followed another person and engage in a course of conduct and repeatedly committed acts over a period of time intentionally placing and attempting to place another person in reasonable fear of physical injury." Regarding Count Two, the amended complaint states that Ms. Mees "with intent to harass, annoy and alarm a specific person, intentionally engaged in a course of conduct directed at such person which was likely to cause such person to reasonably fear physical injury and serious physical injury, the commission of a sex offense against, and the kidnapping, unlawful imprisonment and death of such person." Regarding Count Three, the amended complaint states that Ms. Mees "with intent to harass, annoy, threaten and alarm another person, communicated with a person, anonymously and otherwise, by telephone, by telegraph, and by mail, and by transmitting and delivering any other form of written communication, in a manner likely to cause

5

annoyance and alarm." Regarding Count Four, the amended complaint states that Ms. Mees "intentionally and for no legitimate purpose, engaged in a course of conduct directed at a specific person and knew and reasonably should have known that such conduct caused material harm to the mental and emotional health of such person where such conduct consisted of following, telephoning and initiating communication and contact with such person, and the defendant was previously clearly informed to cease that conduct." Regarding Count Five, the amended complaint states that Ms. Mees "with intent to harass, annoy and alarm another, engaged in a course of conduct which alarmed and seriously annoyed another person and which served no legitimate purpose."

The acts alleged arise out of a more than 4 year romantic affair between Ms. Mees and Mr. Willem Buiter. Since July 2008, the two met at hotels and homes in New York and multiple international cities. As Ms. Mees was only one of many women with whom Mr. Buiter was sleeping, Mr. Buiter's interest in her and their love affair was losing steam. In an e-mail dated February 10, 2012, when Ms. Mees asked Mr. Buiter if he sleeps with other women when he is in New York, Mr Buiter bluntly responded, "At last you get it!" (A copy of the e-mail is attached hereto as **Exhibit N**). Mr. Buiter, however, continued to contact Ms. Mees over Skype and other social media outlets even in the spring of 2013, after a cease and desist letter was sent by a lawyer representing Mr. Buiter to Ms. Mees. His pattern of connecting and disconnecting with her was typical and consistent with his contact with her throughout their relationship. Mr. Buiter even continued to contact Ms. Mees after an Order of Protection was issued in this case (**Exhibit R**).

Ms. Mees, after years of being intimate with Mr. Buiter, developed deep feelings for him. Ms. Mees tried to rekindle their relationship. Mr. Buiter, a married man with children, sensing his marriage was at risk, now seeks to damage Ms. Mees's reputation by bringing the instant case, in order to protect his own reputation.

In deciding this motion, I request the Court to consider the C.P.L. 170.40/ C.P.L. 210.40 factors described in the following paragraphs:

Prejudice to the Defendant: The Court should consider "any prejudice resulting to the defendant by the passage of time." People v Trait, 70 AD2d 1057, 1058 (4th Dept 1979). The duration of these pending charges greatly prejudice Ms. Mees. Because of the pending charges, Ms. Mees has lost professional opportunities, among other things. Specifically, New York University, where she was an adjunct professor before this case, will now no longer allow her to be on their faculty.

Evidence of Guilt: Any evidence arises out of allegations by Mr. Buiter, who is seeking to protect his reputation. His allegations consist mostly of misconstrued facts and outright lies. In addition, most of the alleged acts on which the People rely occurred outside of the County of New York, and outside the United States. In the amended complaint, the complainant falsely states that he received and read many of the e-mails inside his home in the County and State of New York. However, he only moved to New York on February 15, 2013 and was travelling abroad for much of the time since then.

6

<u>Misstatements:</u> Most of Mr. Buiter's sworn statements to the New York Police Department are false, incomplete, distorted, or misleading. Having aired his original false allegations to the press, on August 5, 2013, Mr. Buiter significantly changed the factual basis for the criminal charges brought against Ms. Mees in a new sworn statement to the District Attorney. Examples of the misstatements in the amended complaint are as follows:

1. Mr. Buiter creates the impression that Ms. Mees flooded him with 3000 e-mails since November 7, 2009. But this number of e-mails—an average of two e-mails per day—is not out of the ordinary for two lovers who were involved in an affair over more than four years, which consisted in large part of flirtations over social media and the internet. It is certainly not extraordinary in light of the fact that Mr. Buiter himself sent Ms. Mees almost 1000 e-mails since November 7, 2009. This includes at least 208 e-mails since July 1, 2011(**Exhibit A**). These e-mails have been provided to A.D.A. Samantha Schott separate and apart from this motion.

2. Mr. Buiter complains that Ms. Mees sent him sexually explicit e-mails in May and June, 2013, however sexually explicit e-mails are not unusual given their history of sexually explicit e-mails. Mr. Buiter repeatedly asked for nude photos from Ms. Mees. On August 6, 2011, in response to artistic drawings of female nudes by Marlene Dumas, which Ms. Mees had sent Mr. Buiter, he wrote: 'Thank you. Pictures like that of yourself are always welcome.' (**Exhibit B**). Similarly, on September 12, 2011, Mr. Buiter wrote: "Nice. Now show me something new. Preferably original and personal" (**Exhibit C**). Mr. Buiter was appreciative of the photos that Ms. Mees sent him. On June 24, 2011, for example, Mr. Buiter wrote in response to a photo that Ms. Mees sent of herself masturbating: "Thanks! I needed that!" (**Exhibit D**). In addition, most of Ms. Mees's e-mails in May and June of 2013 to Mr. Buiter were simply requests to make love to her.

3. Mr. Buiter's allegation that Ms. Mees tried to meet him in May 2010 at a meeting in Beijing, is also completely false and misleading. Ms. Mees, a scholar of the Chinese economy, had already been in China for six days, where she had traveled on May 20, 2010 to do research and learn Chinese. She stayed in The Opposite House hotel on the other side of Beijing (**Exhibit E**). Therefore, their simultaneous presence in Beijing was purely coincidental. More importantly, Mr. Buiter has failed to mention that he and Ms. Mees in fact spent the night together on May 26, 2010 in his hotel The Westin in Beijing. The next day, on May 27, 2010, Mr. Buiter and Ms. Mees had a lover's quarrel. Mr. Buiter fails to mention that two weeks later, on June 9, 2010, they made up and again spent the night together in the Soho Grand Hotel in New York.

4. Mr. Buiter further misrepresents that on May 6, 2013, Ms. Mees tried to be let up in his building at 60 Riverside Boulevard in New York. This is false. Ms. Mees had been in the building all evening for an official dinner at the invitation of the Dutch consul general who lives on the 10th floor of 60 Riverside Boulevard (**Exhibit F**). If Ms. Mees had wanted, she could have gone straight from the 10th to the 12th floor where Mr. Buiter lives. Instead, Ms. Mees merely asked the doorman in the lobby, on her way out, whether Mr. Buiter was home. **She did not ask to be let up to his apartment.**

5. Mr. Buiter and Ms. Mees had regular sexual encounters both before and after July 1, 2011. On August 19, 2011, for example, Mr. Buiter spent the night with Ms. Mees in her apartment in Brooklyn. Around 11 PM that evening, as Mr. Buiter was travelling to Ms. Mees's apartment, he e-mailed her to ask for the cross street of her apartment building (**Exhibit G**). A few days earlier, on August 16, 2011, Mr. Buiter and Ms. Mees had a sexual encounter in the afternoon in Ashley's Inn in Edgartown on Martha's Vineyard.

6. On January 12, 2012, Mr. Buiter and Ms. Mees had dinner with four of Mr. Buiter's co-workers of Citigroup in hotel The Grand in Amsterdam. Mr. Buiter and Ms. Mees subsequently spent the night together in hotel The Grand. (Shortly after midnight, Ms. Mees was present when Mr. Buiter made a long phone call from the hotel room to a bank believed to be in London to discuss a money transfer to his son David in the United States. Phone records and bank records will confirm these facts.)

7. In his original sworn statement, Mr. Buiter claimed that Ms. Mees harassed his children. There was no basis for this allegation and this claim has now been dropped altogether. Mr. Buiter, on the other hand, did not shy away from using his son David's e-mail to organize sexual encounters with Ms. Mees. On November 13, 2011, for example, Mr. Buiter blind-copied Ms. Mees on an e-mail to his son David to alert Ms. Mees to the fact that he was spending the night in New York (**Exhibit H**). At that time, Mr. Buiter's wife had just left and was on her way to the airport to return to London. Mr. Buiter and Ms. Mees subsequently spent the night together in the Soho Grand Hotel in New York. The next morning, on November 14, 2011, Mr. Buiter made a telephone call to his wife to tell her he loved her, while he was still together in the hotel room with Ms. Mees.

8. Mr. Buiter also used his Facebook page to guide Ms. Mees to the hotels in New York where he was staying. On January 17, 2011, for example, Mr. Buiter led Ms. Mees to the Sheraton Hotel on Canal Street in New York. A month earlier, on December 16, 2010, Mr. Buiter used his Facebook page to invite Ms. Mees to the Gramercy Park Hotel in New York.

9. In addition to the at least 25 sexual encounters in Ms. Mees's apartment and hotels, Mr. Buiter and Ms. Mees spent dozens of hours each year on Skype. Mr. Buiter and Ms. Mees often engaged in 'Skype-sex' during which Mr. Buiter would regularly masturbate in front of the camera, using the online video-service. On June 26, 2012, for example, Mr. Buiter was in Monaco (Europe) and reached out to Ms. Mees on Skype, first at 12.53 PM EST and then at 5.56 PM EST (**Exhibit I**).

10. Mr. Buiter also reached out to Ms. Mees asking for friendly advice and support. On July 6, 2012, for example, Mr. Buiter asked Ms. Mees to help him find and apartment in New York and to schedule house viewings for him on the weekend of July 14 – 15, 2012. (**Exhibit J**).

11. Mr. Buiter complained that on September 14, 2012, Ms. Mees sent him an e-mail wishing his plane would fall out of the sky. But Ms. Mees recalled that e-mail within 5 minutes of sending it.

12. Mr. Buiter also refers to a picture of two little dead birds in tiny boxes, which Ms. Mees sent to Mr. Buiter on May 3, 2013. As Mr. Buiter was well aware, this picture is the work of an artist, in fact an artist whose work Mr. Buiter knows very well (**Exhibit K**).

13. Mr. Buiter complains that Ms. Mees did not comply with a cease-and-desist letter that she received on March 5, 2013. But Mr. Buiter omits that he himself continued to contact Ms. Mees and Ms. Mees's friends. For example, in the last week of March 2013, Mr. Buiter asked a close female friend of Ms. Mees, who is 32 years his junior, out for dinner in New York. Mr. Buiter had never met that woman in person and he was admonished since March 5, 2013 from contacting Ms. Mees's friends (**Exhibit L**).

14. According to Ms. Mees' female friend, Mr. Buiter's dinner invitation to her was sexually motivated (**Exhibit M**).

15. By Mr. Buiter's own account, he has had sexual relations with at least as many women as the number of articles he has published (not limited to peer-reviewed journals), which exceeds 400.

16. Mr. Buiter told Ms. Mees more than once that he was having sexual relations with other women as well. For example, in an e-mail of February 10, 2012 Mr. Buiter wrote "At last you get it!" in response to Ms. Mees's question whether he was sleeping with other women in New York besides her (**Exhibit N**).

17. No longer does the factual statement part of the complaint suggest that Ms. Mees's e-mails became increasingly "bizarre and erratic." Instead, Mr. Buiter now states that, after years of sexual encounters, he suddenly found Ms. Mees's requests to meet for a drink, which she sent him between May 26 and June 27, 2013, "annoying and alarming."

18. But even that is untrue. On June 13, 2013, a mere 18 days before Ms. Mees was arrested in this case, Mr. Buiter sent Ms. Mees his new contact details in London (**Exhibit O**).

19. *As recently as June 19, 2013*, only 12 days before Ms. Mees was arrested, Mr. Buiter connected with Ms. Mees on Skype (**Exhibit P**) Mr. Buiter also actively shared all his new contact details in New York with Ms. Mees.

20. On June 23, 2013, Mr. Buiter disconnected Ms. Mees from Skype, only to reconnect with her on June 26, 2013 (**Exhibit Q**). He kept the Skype connection alive after Ms. Mees was arrested and released, and only disconnected Ms. Mees from Skype on August 2, 2013.

21. On August 5, 2013 Mr. Buiter signed the new sworn statement in which he alleges that he read many of the e-mails between November 2009, and July 1, 2013 while in his home in the County and State of New York, but he did not move to New York City until February 15, 2013. Prior thereto, he lived abroad, outside the United States. Since February 15 2013 Mr. Buiter has also been outside of the United States for a considerable period of

9

time, because he travels extensively for his work, and also maintains a second home in London where his wife lives.

22. On August 7, 2013, Mr. Buiter again sent Ms. Mees an invitation to connect (on LinkedIn) (**Exhibit R**).

23. Mr. Buiter's actions on e-mail, Skype, LinkedIn and other social media demonstrate that he did not feel threatened by Ms. Mees at all - quite the opposite.

No Criminal Record: Ms. Mees has no prior criminal convictions or incidents with law enforcement.

Misconduct of Law Enforcement Personnel: This remains unknown.

For these reasons, the defendant requests for an order dismissing the charges in the interest of justice.

### III. MOTION TO DISMISS THE COMPLAINT FOR FACIAL INSUFFICIENCY

A misdemeanor complaint may be dismissed if it contains only conclusory language unsupported by evidentiary facts as it would be insufficient under CPL Section 100.40(4)(b) and CPL Section 100.15(3). See People v. Dumas, 68 N.Y.2d 729 (1986); People v. Campbell, 533 N.Y.S.2d 666, 668 (N.Y. Civ. Co. 1988). In Dumas, the Court of Appeals held that the complaint was properly dismissed on the grounds that it was insufficient because it failed to allege evidentiary facts supporting the police officer's conclusion that the substance sold by the defendant was actually marijuana. Dumas, 68 N.Y.2d at 730.

With respect to the charge of Menacing in the Second Degree, the People fail to provide evidentiary facts in its complaint supporting the conclusion that Ms. Mees "intentionally plac[ed] and attempt[ed] to place another person in reasonable fear of physical injury." While the complainant alleges that Ms. Mees sent an e-mail to him stating that she hopes his "plane falls out of the sky," that statement cannot support an intention to place another person in reasonable fear of physical injury. Rather, it is a fantastical utterance out of anger with no indications of specific plans or thoughts to harm anyone in anyway. In addition, within five minutes of sending that e-mail, Ms. Mees recalled it. The amended complaint also states that Ms. Mees sent Mr. Buiter e-mails containing pictures of dead birds, however, the picture that Ms. Mees e-mailed to Mr. Buiter was a picture of artwork by an artist who is a mutual friend. Ms. Mees could not have intended for it to place Mr. Buiter in reasonable fear of physical injury.

Furthermore, the standard for the requisite "reasonable fear" is objective and must be considered in light of circumstances surrounding the victim at the time in question, the relevant knowledge the victim had about the actor, and any prior experiences of the victim relevant to

10

showing a reasonable basis for the expressed fear. In re Kori W., 40 A.D.3d 479, 480 (1st Dept., 2007); People v. Demisse, 24 A.D.3d 118 (1st Dept., 2005). The People fail to provide any evidentiary facts supporting the possibility that the complainant could have reasonably feared physical injury by Ms. Mees. The complaint does not allege any facts concerning the victim at the time period in question, the victim's knowledge of the defendant acting maliciously or violently at the time period in question, nor does it allege any prior experiences of the complainant showing a reasonable basis for expressed fear. While Mr. Buiter states that the alleged acts caused him annoyance and alarm and to fear for his safety, he does not allege specific facts attesting to such. In fact, Mr. Buiter continued to contact Ms. Mees throughout the spring of 2013 and as recently as August of this year. Such contact is inconsistent with his allegations of expressed fear.

With respect to the charge of Stalking in the Third Degree, the People fail to provide evidentiary facts supporting the conclusions that Ms. Mees had the requisite "intent to harass, annoy and alarm a specific person" and that the course of conduct "was likely to cause such person to reasonably fear physical injury and serious physical injury, the commission of a sex offense against, and the kidnapping, unlawful imprisonment and death of such person." Mere sending of e-mails over a long period of time when Ms. Mees and the complainant had had a four-year bilateral affair does not demonstrate the requisite intent to harass, annoy or alarm. The complaint does not allege any facts regarding the surrounding circumstances that would demonstrate intent. Moreover, the complaint does not allege any facts supporting the conclusion that Ms. Mees's conduct was likely to cause Ms. Buiter to reasonably fear physical injury. As discussed above, an angry utterance because of their dissipating affair, revoked five minutes after it was sent, stating that she hopes Ms. Buiter's plane falls out of the sky cannot lead anyone to reasonably fear physical injury.

With respect to the counts of Aggravated Harassment in the Second Degree, the People fail to provide evidentiary facts supporting the conclusions that Ms. Mees possessed the requisite "intent to harass, annoy, threaten and alarm another person" and that her conduct was "in a manner likely to cause annoyance and alarm." This intent must be established either from the alleged act itself, or from the defendant's conduct and the surrounding circumstances. People v Rodriguez, 19 Misc 3d 830, 833 (Crim Ct 2008) citing People v. Bracey, 41 N.Y.2d 296, 360 N.E.2d 1094, 392 N.Y.S.2d 412 (1977). The mere writing of love letters, even when the letters contain crude or profane statements, and even when the love is unrequited, does not rise to Aggravated Harassment. Rodriguez, 19 Misc 3d at 835 (Crim. Ct. 2008) Citing People v. Franco, 15 Misc.3d 1136(A), 841 N.Y.S.2d 822 (Table), 2007 N.Y. Slip Op. 51011(U) (Crim. Ct. N.Y. Co.2007). Likewise, Ms. Mees's mere sending of e-mails to Mr. Buiter, even if the love was unrequited do not demonstrate an intent to harass, annoy, threaten or alarm Mr. Buiter or that her communications were "likely to cause annoyance and alarm." Therefore, the People fail to provide evidentiary facts to support the counts of Aggravated Harassment in the Second Degree.

With respect to the charge of Stalking in the Fourth Degree, the People, in their complaint, fail to provide evidentiary facts supporting the conclusions that Ms. Mees "intentionally and for no legitimate purpose, engaged in a course of conduct directed at a specific person and knew and reasonably should have known that such conduct caused material harm to the mental and emotional health of such person . . ." To have no "legitimate purpose" means to

11

act in "the absence of a reason or justification to engage someone other than to hound, frighten, intimidate or threaten." People v. Stuart, 100 N.Y.2d 412, 428 (2003). The complaint does not allege facts supporting the conclusion that Ms. Mees communicated with Mr. Buiter in order to "hound, frighten, intimidate or threaten" him. Instead, Ms. Mees's communicating with Mr. Buiter had a legitimate purpose – to try to reconcile their relationship. See Ovsanik v Ovsanik, 89 AD3d 1451, 1452 (4th Dept 2011) (attempting to reconcile with wife was legitimate purpose for sending letters).

Moreover, the complaint does not provide evidentiary facts supporting the conclusion that Ms. Mees "knew or should have known that such conduct caused material harm to the mental and emotional health" of Mr. Buiter. In fact, Mr. Buiter did not suffer any material harm to his mental and emotional health, such as a loss of sleep, and the complaint does not allege that he did. Therefore, with respect to the charge of Stalking in the Fourth Degree, the complaint is insufficient. See People v. Lewis, 909 N.Y.S.2d 321 (NY Co. Crim. Co. 2010) (dismissing complaint for facial insufficiency because defendant did not know or have reason to know that his hostile actions, for example, of blocking the doorway to a roommate, would cause victim to lose sleep).

With respect to the charge of Harassment in the Second Degree, the People fail to provide, in their complaint, evidentiary facts supporting the conclusions that Ms. Mees intended "to harass, annoy and alarm another," by engaging in a course of conduct "which alarmed and seriously annoyed another person and which served no legitimate purpose." As discussed above, the People fail to provide evidentiary facts to support that Ms. Mees held the requisite intent and that she lacked a legitimate purpose in her communications. In addition, the People fail to provide evidentiary facts supporting the conclusion that her conduct alarmed and seriously annoyed the complainant. Mr. Buiter did not allege any specific facts showing that he was annoyed or alarmed, but instead he initiated contact with Ms. Mees over Skype and LinkedIn after the cease and desist letter was sent.

Furthermore, much of the alleged acts in the complaint took place outside the County and State of New York, and any conduct that occurred outside of the County and State of New York cannot be used to establish elements of these misdemeanors, pursuant to CPL Section 20.20.

Pursuant to CPL Section 100.40(4)(b) and CPL Section 100.15(3), the defendant respectfully moves to dismiss this complaint.

IV.   PRIOR CONVICTIONS OR BAD ACTS

Ms. Mees may wish to testify on her own behalf. The People should be precluded from entering into evidence, either on their direct case or during cross examination, any prior arrests, convictions or prior bad acts of Ms. Mees that may exist as the prejudicial effect of introducing such material far outweighs the probative value it might have. (People v. Sandoval, 34NY 2d371,314 NE2d 413, 357 NYS 2d 849; People v. Ventimiglia, 52 NY2d350). Additionally, the defendant requests that the People notify the defendant of all instances, if any, of prior uncharged bad acts that they intend to use at trial.

Should this court decide against the suppression at this time, then the defense, in the alternative, requests a hearing pursuant to People v. Sandoval and People v. Ventigiglia.

## V.     RESERVATION OF RIGHTS

The defendant respectfully requests the right to make any and all further motions as many as may be necessary, based upon information and disclosure which may result from the granting of the requests made herein, and/or information received from any record within a reasonable time. People v. Frigenti, 91 Misc.2d 139, CPL Sec. 255.20(3).

Dated: October 10, 2013
New York, NY

*[signature]*

IRA D. LONDON, ESQ.
Law Offices of London & Robin
99 Park Avenue
Suite 1600
New York, NY 10016
212-683-8000
fax 212-683-9422