CRIMINAL COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY: PART D
-----------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

                            -against-

HELEEN MEES,

                            Defendant.
-----------------------------------------------------------------------x

**NOTICE OF MOTION**

NO. 2013NY050589

Honorable Steve Statsinger

Oral argument requested ☑

RECEIVED
MOTIONS UNIT
2018 JUL 19 A 11: 15
DISTRICT ATTORNEY
NEW YORK COUNTY

**PLEASE TAKE NOTICE** that upon the annexed affidavit, duly sworn on the 18 th day of July, 2018, and the accompanying memorandum of law, upon the indictment and upon all those proceedings previously had herein, Defendant **Heleen Mees** will move this Court at the Courthouse, 100 Centre Street, New York, New York, before the Honorable Steven Statsinger, at a date and time to be fixed by the Court, for a motion pursuant to CPL § 440.10 (h).

**PLEASE TAKE FURTHER NOTICE**, that Defendant reserves the right to make such further motions pursuant to CPL § 255.20 (2) & (3) as may be necessitated by the Court's decision on the within motion and by further developments which, even by due diligence, Defendant could not now be aware.

Dated: July 18, 2018

Signature

HELEEN MEES
THE SWEENEY BUILDING
30 Main Street, Apt. 11H
Brooklyn, New York 11201
heleen@heleenmees.com
(917) 325-5877

*Defendant Pro Se*

To: Clerk of the Court
Hon. Steven Statsinger
District Attorney's Office

CRIMINAL COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY: PART D
----------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

                                                    **AFFIDAVIT IN SUPPORT
                                                  OF CPL § 440.10 MOTION**

               -against-                        NO. 2013NY050589

                                                    STATSINGER J.

HELEEN MEES,
                            Defendant.
----------------------------------------------------------------x

**HELEEN MEES**, defendant *pro se,* declares the following to be true under the penalty of perjury:

    1.    On July 1, 2013, I was arrested in on various charges which stem from a complaint by fellow economics professor and chief economist of Citigroup, Willem H. Buiter ("Buiter"). See Exhibit A. At the time, I was a New York University economics professor, political commentator, author, and public figure in my country of origin, the Netherlands. Buiter incited the police to arrest me and the Manhattan District Attorney's office to prosecute me, by making a series of false statements to the police, including that I harassed him by "sending him naked pictures of [myself] masturbating" that purportedly caused him severe annoyance and alarm.[1]

    2.    As a result of Buiter's false allegations, I spent four days in jail at Rikers Island and the matter was highly publicized all over the world. Following my arrest, I lost my job as a professor at New York University, all my columns in international magazines and newspapers, as well as my speaking engagements and consulting jobs. Due to the publicity surrounding this matter, I have been unable to obtain gainful employment and am left with virtually no sources of

---

[1] This motion is in lieu of a motion for leave to reargue and a motion for leave to appeal the decision of July 2, 2018, denying my petition for writ of *coram nobis* relief.

income more than five years after my arrest. Because of all that has transpired since my arrest and prosecution, I suffer from posttraumatic stress disorder and dysthymia (chronic depression).

3. In view of the substantial falsehoods in the superseding accusatory instrument of August 5, 2013, the Manhattan District Attorney's office offered in March 2014 to discontinue my criminal prosecution by way of an Adjournment in Contemplation of Dismissal. See Exhibit B. Unaware of the trove of unlawful surveillance images in the criminal file, I consented to the ACD, which was entered by the Honorable Steven Statsinger on March 10, 2014. See Exhibit C. On March 9, 2015, the case was dismissed and sealed.

4. Even though the Manhattan District Attorney's office acknowledged that there was no ground for my prosecution, Buiter continued his libelous campaign against me, repeating his false accusations of stalking and harassment in an elaborate public posting on Facebook of March 10, 2014. On June 26, 2014, I filed a complaint against Buiter in the New York Supreme Court, Kings County, on various grounds, including defamation, false arrest, and intentional infliction of emotional distress.

5. Buiter responded on October 6, 2014, with a motion to dismiss to which he attached 1,251 nude photos of me, claiming that I had sent him those photos. I saw the nude photos for the very first time on October 13, 2014, when my attorney forwarded me "Exhibit L", which was an email with 4 PDF-files attached thereto containing 1,251 nude photos. Buiter was, however, unable to produce any of the hundreds of emails to which the photos were purportedly attached. Contrary to what Buiter had represented to the police and prosecution, the 1,251 nude photos were surreptitiously and illegally taken by Buiter himself during his intimate Skype interactions via Skype webcam with me.

I.  **THE NUDE PHOTOS ARE SURREPTITIOUS RECORDINGS BY BUITER**

6. On October 13, 2015, the U.S. District Court for the Southern District of New York ordered Buiter to produce the 1,251 in JPEG-files, which were at the time presented to us as the original photo files. My Dutch counsel then commissioned forensic experts SBV Forensics to examine all 1,251 photographs and all forensically imaged computers that I have had in my possession since 2008. Based on a forensic analysis, SBV Forensics concludes that it is a near certainty that I did not take the photographs, either with a phone, a standalone camera or a webcam, and that it is beyond a reasonable doubt that I did not send the photographs from any of her devices (a true and correct copy of the report by SBV Forensics is attached hereto as Exhibit D).

7. Specifically, SBV Forensics concludes with respect to the photo files:

a. Because the photos were produced in both PDF (1,388) and JPEG format (1,251), it can be determined through a comparison of MD5 hash values and "data carving" that Buiter in fact had more unique nude photos of Mees in his possession than he represented (1,288 instead of 1,251). Among both the PDFs and the JPEGs there were also many duplicates (pp. 3-6).

b. Based on Mees's position in the photos, it is impossible that she manually took the photos herself. Because variations between successive pictures are mostly minor, which indicates only minimal intervals between them, it is also highly unlikely that the photos were taken in auto mode with a timer (pp. 6, 19-20).

c. The format of the photos (640 pixels by 480 pixels, for a total of some 300,000 pixels) is inconsistent with the use of a digital camera. Images taken with digital cameras are measured in millions of pixel ("megapixels") (pp. 7, 19).

3

d. The pictures' VGA resolution IS, however, consistent with the use of either a webcam or a mobile phone camera (pp. 7-8,19).

e. The low number of EXIF metadata captured on the JPEG files is inconsistent, however, with the photos having been taken with a mobile phone. It is also inconsistent with the use of a digital camera. Both would have registered additional metadata, such as various characteristics of the camera lens or the brand and type of the phone used (pp. 8, 19).

f. The EXIF metadata that was found, e.g. data indicating that no flash was used, excludes the possibility that the photos were stills derived from video footage (which does not register any information on the use of a flash) (pp. 8, 19).

g. The depth and camera angles of the photos are also consistent with the use of a webcam (pp. 7, 19).

h. The picture files are consistent with still images taken during a live video chat on a platform like Skype. If the screenshots were taken on an Apple computer, however, such as used by Mees, Apple's operating system (Mac as X) would have saved them as PNG files-not, as is the case here, as lPEGs (pp. 8-9, 19).

i. Photo Booth, which is a standard Apple application does save photos in JPEG format but the photos' metadata is inconsistent with the use of Photo Booth because such use would have automatically registered the application's name as an IPTC field in each file (p. 9).

j. The photos have a resolution of 96 dpi, which is also not consistent with the use of Apple computers or digital cameras, which automatically generate images with

4

        resolution of 72 dpi. The photos' 96 dpi resolution is, however, consistent with the use of a Windows computer (which Mees believes Buiter uses exclusively) (p. 10).

k.    There is no indication on any of Mees's Apple computers that any metadata or file characteristics were manually manipulated. Manual editing would require opening, editing and re-saving each of the 1,288 unique picture files individually and would therefore be extremely time- consuming. No Windows programs and no virtualization software were found on any of Mees's laptops (pp. 10, 19).

8.    With respect to Buiter's possession of the photos but not the emails by which they were supposedly transmitted, SVB Forensics concludes:

a.    It is virtually certain that the photos were never on Mees's laptops. If they were, it would have been possible to retrieve or restore the files forensically. It is nearly impossible and technically very complex to individually remove files in a manner that guarantees the user that the files are forever irretrievable (pp. 11-15, 19-20).

b.    Secure removal of email files in a way that makes retrieval impossible also requires highly specialized knowledge of the workings of the Mac OS X operating system. No emails of the kind Buiter claims existed were found, however, on Mees's computers (pp. 13-15,20).

c.    The "rule" that Buiter claims explains why the photos were saved, while the emails purportedly attaching them were deleted, would in principle have saved identical pictures only once, overwriting prior versions of the same attachment or make. The presence of duplicates of photos in Buiter's files is inconsistent with such workings of the rule (pp. 17-18).

5

    d.    The rule is also inconsistent with the fact that a different picture ("moi.jpg"), which the parties agree Mees did send Buiter (more than once) and for which Buiter can produce the emails to which it was attached, was not saved in the same attachment folder, and that yet a third picture Mees sent ("plaatje.jpg") was also not saved there (p. 18).

    e.    Taking into consideration that the file names contain only a sequential number as well as the fact that numbering did not restart at the first picture from a new session, it is a near certainty that Buiter changed the file names before handing them to the police and the Manhattan District Attorney's office.

9.    Accordingly, Buiter's excuse for his possession of photos of my private parts is not supported by forensics. This leaves no other reasonable explanation than that Buiter took the photos. The forensic investigation also corroborates my account that our intimate interactions via Skype were never meant to be recorded, that I was unaware of the recordings, and that I never consented to being recorded.

## II.    THE NUDE PHOTOS ARE EXCULPATORY EVIDENCE

10.    The 1,251 photos show me nude or partially dressed. There are hundreds of photos in the criminal file in which I am wearing a floral print dress that I bought on April 6, 2011. See Exhibit E. All the photos in which I am wearing said floral print dress were taken on or after April 6, 2011. Buiter not only actively participated in Skype webcam calls in which we would both undress on or after April 6, 2011, he also made extensive records of it for his own personal pleasure, yielding no less than 1,251 unlawful surveillance images. Since no one can be forced to undergo the viewing of sexual activity through Skype webcam, let alone make extensive records

6

of it, the romantic relationship between Buiter and me lasted at least until April 6, 2011. The accusatory instrument of August 5, 2013, alleges that the acts occurred from November 7, 2009 until July 1, 2013. The 1,251 nude photos show that I am innocent of the alleged harassment and stalking at the very least until April 6, 2011. The extent of the stalking, harassment, and menacing is an important factor to be weighed for punishment. The 1,251 unlawful surveillance images are thus material to my guilt or innocence or to my punishment.

11. The accusatory instrument of August 5, 2013, accuses me of sending Buiter 55 'sexually explicit' emails. This must be a reference to the nude photos that Buiter claims I sent him because I never sent Buiter 55 sexually explicit emails. The report by SBV Forensics show that I did not make nor sent Buiter the 1,251 nude photos show and thus that I am innocent of the alleged sending of 55 'sexually explicit' emails. See ¶¶6-9. The 1,251 unlawful surveillance images are thus material to my guilt or innocence or punishment.

12. If Buiter had indeed felt annoyed, alarmed or fearful of me, my nudity, or any of my communications, it stands to reason that Buiter would have destroyed the 1,251 nude photos of me, which he should never have taken in the first place. But not only did Buiter not destroy the 1,251 nude photos, he did the opposite. Buiter saved the 1,251 nude photos on his handheld devices and stored them in his Verizon cloud service so that he could access them anywhere in the world. Buiter's actions do not comport with genuine feelings of annoyance, alarm, and fear, which are a *sine qua non* for the charges of stalking, harassment, and menacing. The 1,251 unlawful surveillance images are thus material to my guilt or innocence or to my punishment.

7

### III. THE NUDE PHOTOS ARE IMPEACHMENT EVIDENCE

13. The nude photos show that Buiter committed the felony sex crime of unlawful surveillance in the second degree when he surreptitiously recorded my private parts. The 1,251 nude photos also show that Buiter swore falsely when handed the police and prosecution the 1,251 unlawful surveillance images as evidence of stalking and harassment, claiming that I had sent him the nude photos and that this caused him severe annoyance and alarm. The criminal complaint of July 1, 2013, literally accuses me of sending Buiter 'naked pictures of [myself] masturbating'. See Exhibit A. The evidence also shows that Buiter fabricated and tampered with evidence by bundling the 1,251 photo files in a pdf-file and changing the file format of the original files into JPEG-files and making hard copies for the Manhattan District Attorney's office. The 1,251 unlawful surveillance images thus go to Buiter's credibility and reliability as the complaining witness.

14. Buiter alleged in the related civil proceedings that he 'accidentally' saved the 1,251 nude photos on the hard-drive of his computer in London. Buiter also alleged that he threw that computer away in December 2012 while still in London and that he destroyed the external hard-drive on which the 1,252 nude photos were saved in December 2013. This course of action, however, is not compatible with the finding of the 1,251 nude photos in Buiter's Verizon cloud service, of which Buiter informed the Amsterdam Court in a letter of November 17, 2015. See Exhibit F.

15. The only explanation for the 1,251 nude photos ending up in Buiter's Verizon cloud service is that he saved the photos on his mobile devices, which cannot happen accidentally. The 1,251 nude photos were thus also not accidentally saved on Buiter's computer in London. Since Buiter did not move to the United States and thus did not start using his Verizon cloud service until April 2013, the finding of the nude photos in his cloud service shows that Buiter held on to 1,251

8

nude photos on his handheld devices until well into 2013, while he was reporting me to the police (Buiter's provider only automatically backs up mobile devices). That means that Buiter was on the one hand complaining to the police about my advances and nudity, while on the other hand enjoying my nudity on his handheld devices.

### IV. THE NUDE PHOTOS WOULD HAVE MATERIALLY AFFECTED MY DECISION TO ACCEPT THE ACD

16. The First Department has ruled that a guilty plea can be overturned because of pre-plea *Brady* violations. In addition to the threshold *Brady* analysis, i.e., whether the evidence is material to the issue of guilt or punishment, the First Department has adopted a standard that also requires an analysis of whether the information, if disclosed, would have materially affected the defendant's decision to plead guilty. See the accompanying Memorandum of Law.

17. On January 25, 2015, my attorneys filed a FOIL-request for the documents in the criminal file. On November 17, 2015, we received from the Manhattan District Attorney's office the FOIL-production, which included about 1200 nude photos of me. See Exhibit G. The nude photos were never mentioned or disclosed during plea discussions and were only shared with us after the case was dismissed and sealed.[2] Therefore, I was prejudiced when I accepted the District Attorney's office to discontinue the prosecution by way of an ACD.

18. I would never have accepted the ACD as an outcome had I known of the trove of unlawful surveillance images in the criminal file. On May 8, 2016, when we had gathered enough evidence that I did not make nor send the 1,251 nude photos to Buiter, my attorney sent a letter to

---

[2] My attorneys alerted the Manhattan District Attorney's office in October 2014, after the ACD was entered, to the fact that any nude photos in the file were exculpatory evidence but at no time did the Manhattan District Attorney's office confirm that such photos were indeed included in the criminal file nor did the Manhattan District Attorney's office share any photo files with us despite our requests.

9

Manhattan District Attorney Cyrus Vance demanding an investigation into Buiter's possession of 1,251 unlawful surveillance images and a dismissal of all the charges in the interest of justice pursuant to CPL § 210.40.

19.     When the Manhattan District Attorney declined on July 6, 2016, to investigate the matter and to dismiss the charges pursuant to CPL § 210.40, I began to look for legal counsel to get the ACD undone. Since I act *pro se*, have more legal proceedings to attend to, and the undoing of an ACD is unchartered territory, it took me some time to move this Court to undo the ACD. I look forward to stand trial over Buiter's false allegations.

## V.     MY ARREST AND PROSECUTION ARE NOT A NULLITY

20.     Pursuant to CPL § 170.55(8), "Upon granting [an ACD], the arrest and prosecution shall be *deemed* a nullity'. As the wording of the ACD statute indicates, the nullity of my arrest and prosecution is a legal fiction and not an actuality. According to CPL § 160.50, the records can still be made available to (ii) a law enforcement agency upon ex parte motion in any superior court, or in any district court, city court or the criminal court of the city of New York provided that such court sealed the record, if such agency demonstrates to the satisfaction of the court that justice requires that such records be made available to it. Since the records can be made available to a law enforcement agency upon ex parte motion, my arrest and prosecution are not a nullity.

21.     Federal law enforcement agencies do *not* deem my arrest and prosecution a nullity. Each time I enter the United States, I must go through secondary inspection, which means that I am being detained at the U.S. border virtually on a monthly basis. According to U.S. Customs and Border Control officers, I will have to go through secondary inspection until I reach the age of 95. I have contacted the office in Albany that is charged with the sealing of criminal records in New

10

York State, and they say that my record is sealed. I have contacted the Department of Homeland Security but they say nothing will change as long as the ACD is not vacated. The record is thus only sealed under New York law, not under U.S. law. Because the Judiciary in New York cannot preclude me being detained at the border over the ACD, my arrest and prosecution are not a nullity.

22.   In January 2016, almost a year after my ACD had expired, I had great difficulty renewing my journalist visa even though I had been a legal resident of the United States for 16 years. I never had any difficulty renewing my U.S. visa before. The officers of the U.S. Consulate-General in Amsterdam wanted to see all the documents in the criminal file even though my criminal defense attorney, Ira D. London Esq., affirmed that the arrest and prosecution should be deemed a nullity. Only after handing all the documents and coming in for an interview with the U.S. consul-general in Amsterdam, I got a new visa but it has a special stamp saying CLASS RECORD REVIEWED – NO INELEGIBILITY REVEALED. See Exhibit H. This was still under the Obama administration. The new administration may well decide differently. Because the Judiciary of New York cannot preclude that upon renewal of my U.S. visa the new administration will hold the ACD against me, my arrest and prosecution are not a nullity.

23.   This is even more pertinent as the current administration has issued a new version of the I-765 application for work authorization, which specifically asks about arrests. Under question number 23, which pertains to those who are applying under eligibility categories (c)(35) or (c)(36), the form asks: "have you EVER been arrested for and/or convicted of any crime?" (emphasis not added). The I-765 application for work authorization specifically notes that the United States Citizenship and Immigration Services (USCIS) reserves the right, in its own discretion, to deny any application if the applicant has been arrested or convicted of any crime.

11

Because the Judiciary in New York cannot preclude that USCIS will hold the ACD against me, my arrest and prosecution are not a nullity.

24. According to leading legal scholars, the New York ACD may be considered a "conviction" for the purpose of U.S. immigration law. Under the Immigration and Nationality Act (INA) Section 101(a)(48)(A), a conviction occurs when:

1) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt; or,
2) the judge has ordered some form of <u>punishment</u>, <u>penalty</u>, or <u>restraint</u> on the alien's liberty to be imposed. (emphasis added)

25. While I did not enter a guilty plea, the fact that this Court imposed 12 *mandatory* therapy sessions may be interpreted as a conviction for the purpose of INA Section 101(a)(48)(A)(2). Because the Judiciary of New York cannot preclude that U.S. law enforcement agencies will deem my ACD a conviction under INA Section 101(a)(48)(A), my arrest and prosecution are not a nullity. In fact, the current administration has already broadened the definition of 'criminal' to include anyone who has been charged with a criminal offense, even if it has not led to a conviction.[3] So far the broadened definition has been used in guidelines that set out which unauthorized immigrants are a priority for deportation. However, it seems only a matter of time for the broadened definition to be applied to legal immigrants as well.

26. The nullity of the ACD is a legal fiction that the Judiciary in New York can only enforce within the confines of the State of New York and even then, only vis-à-vis New York law enforcement agencies, not vis-à-vis U.S. law enforcement agencies. Since the current administration does not deem my arrest and prosecution a nullity and may even treat the ACD as a conviction, my arrest and prosecution are not a nullity.

---

[3] See Section 5(a) of the Executive Order: Enhancing Public Safety in the Interior of the United States, that was signed on January 25, 2017.

27. I am entitled to post-judgment relief pursuant to CPL § 440.10(h). The ACD was obtained in violation of my right as a defendant under the Constitution of the State of New York and the Constitution of the United States because the prosecution suppressed evidence material to my guilt or innocence or to my punishment and thus violated Due Process.

## CONCLUSION

WHEREFORE, for the foregoing reasons and for reasons set out in the accompanying Memorandum of Law, I respectfully submit that my CPL § 440.10(h) motion be granted and the ACD vacated, and that this Court issue any other relief it deems just and equitable.

Signature

HELEEN MEES
THE SWEENEY BUILDING
30 Main Street, Apt. 11H
Brooklyn, New York 11201
heleen@heleenmees.com
(917) 325-5877

*Defendant Pro Se*

Sworn to before me this 18th day of July, 2018

**CATHERINE ERCOLE**
**Notary Public - State of New York**
**No. 01ER6214008**
**Qualified in New York County**
**Commission Expires November 23, 2021**

To: Clerk of the Court
Hon. Steven Statsinger
District Attorney's Office

13