UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
HELEEN MEES,
       Plaintiff,

   v.

CITY OF NEW YORK
MANHATTAN DISTRICT ATTORNEY'S OFFICE
CYRUS VANCE JR.
NITIN SAVUR
JEANINE LAUNAY
SAMANTHA SCHOTT,
       Defendants.
------------------------------------------------------------------X

Index No. 19-CV-7346

**VERIFIED FIRST
AMENDED COMPLAINT**

Jury Trial Demanded
On all Issues Triable

HELEEN MEES, plaintiff *pro se* herein, declares under penalty of perjury and pursuant to 28 U.S.C.

§1746(1) that the following is true and correct:

## PURPOSE OF ACTION

1.  I am the plaintiff *pro se* in this action.  I commence this action for the purpose of seeking

appropriate remedies and redress for continuing violations of rights secured by the United States

Constitution and under the law of the State of New York against the City of New York, the Manhattan

District Attorney's Office, Cyrus Vance Jr., Nitin Savur, Jeanine Launay, and Samantha Schott. Upon

knowledge and otherwise upon information and belief, I allege as follows:

## JURISDICTION AND VENUE

2.  I have exhausted all remedies in New York State Court. *See Poventud v. City of N.Y.*, 750

F.3d 121 (2d Cir. 2014).

3.  This Court has original subject matter jurisdiction of this action as a Federal Question

pursuant to 28 U.S.C. § 1331.

4.      This Court has original subject matter jurisdiction of this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2).

5.      This Court has supplemental jurisdiction over my causes of action arising under New York State law pursuant to 28 U.S.C. § 1367.

6.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) as defendants' office and place of business are located in the Southern District of New York and most acts and events complained of occurred in this District.

## THE PARTIES

6.      Plaintiff HELEEN MEES is an economics professor, most recently at New York University's Wagner Graduate School of Public Service, a columnist, and the author of four books.  I am a citizen and resident of the Netherlands at Weesperzijde 12-4, 1091 EB Amsterdam.

7.      Defendant CITY OF NEW YORK is located at City Hall, New York, NY 10007. It is a municipal corporation and the public employer of the defendants.

8.      Defendant CYRUS VANCE JR. is the District Attorney in the Manhattan District Attorney's Office, located at One Hogan Place, New York, NY 10013, and a U.S. citizen.

9.       Defendant NITIN SAVUR is Executive Assistant District Attorney in the Manhattan District Attorney's Office, located at One Hogan Place, New York, NY 10013, and a U.S. citizen.

10.      Defendant JEANINE LAUNAY is Deputy Chief of the Special Victims Bureau in the Manhattan District Attorney's Office, located at One Hogan Place, New York, NY 10013, and a U.S. citizen.

11.       Defendant SAMANTHA SCHOTT is Assistant District Attorney in the Manhattan District Attorney's Office, located at One Hogan Place, New York, NY 10013, and a U.S. citizen.

12.      I sue Vance, Savur, Launay, and Schott in their official as well as individual capacities.

## NATURE AND FACTS OF THE ACTION

13.     This action arises from the prosecution of me on charges of harassing Willem H. Buiter, the chief economist of Citigroup, professor at Columbia University, and senior fellow of the Council of Foreign Relations.

14.     I was a New York University economics professor, political commentator, author, and public figure in my country of origin, the Netherlands, when I was arrested on July 1, 2013, in New York City on various charges which stem from a complaint filed by my lover of four years, Willem H. Buiter ("Buiter"). Buiter incited the police to arrest me by making a series of false statements to the police, including that I harassed him by sending 'naked pictures' of myself that severely annoyed and alarmed him. The superseding accusatory instrument of August 5, 2013, no longer accuses me of sending Buiter 'naked pictures' of myself. Instead, it alleges that the conduct complained of lasted from November 7, 2009, until July 1, 2013.

15.     As a result of Buiter's false allegations, I spent four days in jail at Rikers Island and the matter was highly publicized all over the world, including on the front page of the New York Daily News. Following my arrest, I lost my job as a professor at New York University, all columns in international magazines and newspapers, as well as all speaking engagements and consulting jobs. Due to the publicity surrounding this matter, I have been unable to obtain gainful employment and am left with virtually no sources of income. Because of all that has transpired since my arrest and prosecution, I suffer from posttraumatic stress disorder and major depressive disorder.

16.     In February 2014, my attorneys met with Launay and Schott to discuss a resolution of the case. In view of the substantial falsehoods in the criminal complaint, the Manhattan District Attorney's Office offered in March 2014 an Adjournment in Contemplation of Dismissal (ACD) pursuant to Criminal Procedure Law § 170.55. Primarily for financial reasons, I consented to the ACD, which was entered by the Honorable Steven Statsinger on March 10, 2014. *See* Ex. A.

17.     Even though the Manhattan District Attorney's Office acknowledged that there was no ground for my prosecution, Buiter continued his libelous campaign against me, repeating his false accusations in an elaborate public posting on Facebook of March 10, 2014. In April 2014, I filed an application in the U.S. District Court for the Southern District of New York for discovery use in a foreign proceeding pursuant to 28 U.S.C. § 1782, which Chief Justice Loretta Preska denied on May 6, 2014.

18.     On June 26, 2014, I filed a complaint against Buiter in the New York Supreme Court, Kings County, on various grounds, including defamation, false arrest, and intentional infliction of emotional distress. Buiter responded on October 6, 2014, with a motion to dismiss to which he attached 1,251 'naked pictures' of me, claiming that I had sent him those photos. I saw the images for the very first time on October 13, 2014, when my attorney forwarded me "Exhibit L", which was an email with 4 PDF-files attached thereto containing 1,251 unlawful surveillance images. Buiter was, however, unable to produce any of the hundreds of emails to which the photos were purportedly attached. Contrary to what Buiter had represented to the police and prosecution, the 1,251 unlawful surveillance images were surreptitiously and illegally taken by Buiter himself during his intimate Skype interactions via Skype webcam with me.

19.     On October 20, 2014, my counsels, Ira D. London and Olav Haazen, sent a letter to Assistant District Attorney Samantha Schott to alert her to the fact that the Manhattan District Attorney's office had suppressed material exculpatory evidence that goes to my innocence or guilt. *See* Ex. B. Schott did not respond to the letter. On October 28,2014, London and Haazen sent a letter to Manhattan District Attorney Cyrus Vance, demanding an investigation into the 1,251 images and an immediate dismissal of all the charges in the interest of justice. *See* Ex. C. Vance's secretary, Marlene Turner, assured the secretary of David Boies Esq. on October 28, 2014, that Vance would read the letter personally.

20.     On November 18, 2014, my attorneys Olav Haazen and Brooke Alexander met with Executive Assistant District Attorney Nitin Savur, who is a member of District Attorney Cyrus Vance's Executive Team. On February 10, 2015, Savur informed us that the charges would not be dismissed in the interest of justice. However, Savur told my counsels that I could come back if I had more evidence and that the case could still be reopened once it was sealed. *See* Ex. D.

21.     Savur refused to produce any of the unlawful surveillance images that Buiter alleged he had handed to the police and prosecution even though the files in Savur's possession contained metadata that we did not have. Savur made us file a FOIL request instead by which the Manhattan District Attorney's office only complied 11 months later, on December 1, 2015. *See* Ex. E. The criminal file contained about 1200 unlawful surveillance images of me.

22.     Buiter refused to produce the 1,251 unlawful surveillance images in JPEG-format in the related civil litigation. Only after the Court of Appeals for the Second Circuit overturned on July 17, 2015, the decision of Chief Judge Preska, Buiter was ordered on remand to hand over the 1,251 photo files in JPEG-format. *See Mees v. Buiter*, 793 F.3d 291 (2d Cir. 2015). After Buiter produced the JPEG files on October 23, 2015, my Dutch counsel commissioned forensic experts SBV Forensics to examine all 1,251 photographs and all forensically imaged computers that I had had in my possession since 2008.

23.     Based on this forensic analysis, SBV Forensics concludes in its report of April 2016, that it is a near certainty that I did not take the photographs, either with a phone, a standalone camera or a webcam, and that it is beyond a reasonable doubt that I did not send the photographs from any of my devices. *See* Ex. F. Specifically, SBV Forensics concludes with respect to the photo files:

a.     Because the photos were produced in both PDF (1,388) and JPEG format (1,251), it can be determined through a comparison of MD5 hash values and "data carving" that Buiter in fact had more unique naked photos of Mees in his possession than he represented

(1,288 instead of 1,251). Among both the PDFs and the JPEGs there were also many duplicates (pp. 3-6).

b.   Based on Mees's position in the photos, it is impossible that she manually took the photos herself. Because variations between successive pictures are mostly minor, which indicates only minimal intervals between them, it is also highly unlikely that the photos were taken in auto mode with a timer (pp. 6, 19-20).

c.   The format of the photos (640 pixels by 480 pixels, for a total of some 300,000 pixels) is inconsistent with the use of a digital camera. Images taken with digital cameras are measured in millions of pixel ("megapixels") (pp. 7, 19).

d.   The pictures' VGA resolution, however, consistent with the use of either a webcam or a mobile phone camera (pp. 7-8,19).

e.   The low number of EXIF metadata captured on the JPEG files is inconsistent, however, with the photos having been taken with a mobile phone. It is also inconsistent with the use of a digital camera. Both would have registered additional metadata, such as various characteristics of the camera lens or the brand and type of the phone used (pp. 8, 19).

f.   The EXIF metadata that was found, e.g. data indicating that no flash was used, excludes the possibility that the photos were stills derived from video footage (which does not register any information on the use of a flash) (pp. 8, 19).

g.   The depth and camera angles of the photos are also consistent with the use of a webcam (pp. 7, 19).

h.   The picture files are consistent with still images taken during a live video chat on a platform like Skype. If the screenshots were taken on an Apple computer, however, such as used by Mees, Apple's operating system (Mac as X) would have saved them as PNG files-not, as is the case here, as lPEGs (pp. 8-9, 19).

i.  Photo Booth, which is a standard Apple application does save photos in JPEG format but the photos' metadata is inconsistent with the use of Photo Booth because such use would have automatically registered the application's name as an IPTC field in each file (p. 9).

j.  The photos have a resolution of 96 dpi, which is also not consistent with the use of Apple computers or digital cameras, which automatically generate images with resolution of 72 dpi. The photos' 96 dpi resolution is, however, consistent with the use of a Windows computer (which Mees believes Buiter uses exclusively) (p. 10).

k.  There is no indication on any of Mees's Apple computers that any metadata or file characteristics were manually manipulated. Manual editing would require opening, editing and re-saving each of the 1,288 unique picture files individually and would therefore be extremely time- consuming. No Windows programs and no virtualization software were found on any of Mees's laptops (pp. 10, 19).

22.  With respect to Buiter's possession of the photos but not the emails by which they were supposedly transmitted, SVB Forensics concludes:

l.  It is virtually certain that the photos were never on Mees's laptops. If they were, it would have been possible to retrieve or restore the files forensically. It is nearly impossible and technically very complex to individually remove files in a manner that guarantees the user that the files are forever irretrievable (pp. 11-15, 19-20).

m.  Secure removal of email files in a way that makes retrieval impossible also requires highly specialized knowledge of the workings of the Mac OS X operating system. No emails of the kind Buiter claims existed were found, however, on Mees's computers (pp. 13-15,20).

n.  The "rule" that Buiter claims explains why the photos were saved, while the emails purportedly attaching them were deleted, would in principle have saved identical pictures only once, overwriting prior versions of the same attachment or make. The presence of

duplicates of photos in Buiter's files is inconsistent with such workings of the rule (pp. 17-18).

o.  The rule is also inconsistent with the fact that a different picture ("moi.jpg"), which the parties agree Mees did send Buiter (more than once) and for which Buiter can produce the emails to which it was attached, was not saved in the same attachment folder, and that yet a third picture Mees sent ("plaatje.jpg") was also not saved there (p. 18).

p.  Taking into consideration that the file names contain only a sequential number as well as the fact that numbering did not resta11 at the first picture from a new session, it is a near certainty that Buiter changed the file names before handing them to the police and the Manhattan District Attorney's office.

23.     Accordingly, Buiter's excuse for his possession of photos of my private parts is not supported by forensics. SBV Forensics conlcudes that this leaves no other reasonable explanation than that Buiter took the photos. The forensic investigation also corroborates my account that our intimate interactions via Skype were never meant to be recorded, that I was unaware of the recordings, and that I never consented to being recorded.

24.     The 1,251 unlawful surveillance images show me nude or partially dressed. There are hundreds of photos in the criminal file in which I am wearing a floral print dress that I bought on April 6, 2011. All the photos in which I am wearing said floral print dress were taken on or after April 6, 2011. Buiter not only actively participated in Skype webcam calls in which we would both undress on or after April 6, 2011, he also made extensive records of it for his own personal pleasure, yielding no less than 1,251 unlawful surveillance images. Since no one can be forced to undergo the viewing of sexual activity through Skype webcam, let alone make extensive records of it, the romantic relationship between Buiter and me lasted at least until April 6, 2011.

25.     The accusatory instrument of August 5, 2013, alleges that the conduct complained of

occurred from November 7, 2009 until July 1, 2013. The 1,251 unlawful surveillance images show that I am innocent of harassing, stalking, and menacing Buiter at the very least until April 6, 2011. The extent of the stalking, harassment, and menacing, if it occurred at all, is an important factor to be weighed for punishment.

26.     The accusatory instrument of August 5, 2013, accuses me of sending Buiter 55 'sexually explicit' emails. This must be a reference to the 'naked pictures' that Buiter claims I sent him because I never sent Buiter 55 sexually explicit emails. The report by SBV Forensics shows that I did not make nor sent Buiter the 1,251 unlawful surveillance images and thus that I am innocent of the alleged sending of 55 'sexually explicit' emails. The 1,251 unlawful surveillance images are thus material to my guilt or innocence or punishment.

27.     If Buiter had indeed felt annoyed, alarmed or fearful of me, my nudity, or any of my communications, it stands to reason that Buiter would have destroyed the 1,251 unlawful surveillance images, which he should never have taken in the first place. But not only did Buiter not destroy the 1,251 unlawful surveillance images, he did the opposite. Buiter saved the 1,251 unlawful surveillance images on his handheld devices and stored them in his Verizon cloud service so that he could access them anywhere in the world. Buiter's actions do not comport with genuine feelings of annoyance, alarm, and fear, which are a *sine qua non* for the charges of stalking, harassment, and menacing. The 1,251 unlawful surveillance images are thus material to my guilt or innocence or to my punishment.

28.     As the 1,251 unlawful surveillance images constitute material exculpatory evidence, the District Attorney's office should have disclosed them during plea discussions. But ADAs Jeanine Launay and Samantha Schott never mentioned the 1,251 explicit images of me in the criminal file during plea discussions in February 2014 with my counsels, which is remarkable because Buiter handed the prosecution both a USB stick with digital copies that contained the metadata of the images as well as hard copies of the images, making them difficult to overlook given their explicit content.

29.     Moreover, I specified on the motion to dismiss of October 14, 2013, that I only sent Buiter one selfie on June 26, 2011, and attached evidence showing that Buiter responded with grattitude. The selfie was thus not evidence at all that I harassed Buiter.[1] I also submitted evidence on the motion to dismiss showing that Buiter and I interacted sexually via Skype webcam in July 2012.

30.     Launay and Schott never told my attorneys about the 1,251 explicit images in the photo files, which would have been highly inculpatory if I had indeed sent those images against Buiter's will. Instead, Launay and Schott made silly arguments, e.g., that the fact that Buiter and I spent the night more often in his hotel in Manhattan than in my apartment in Brooklyn somehow proved that I harassed him, which shows a culpable state of mind on the part of Launay and Schott.

31.     After my counsel sent a letter to District Attorney Cyrus Vance on October 27, 2014, informing him that any nude photos of me in the criminal file were the product of unlawful surveillance, my counsels met with EADA Savur on November 18, 2014. Savur never confirmed that the criminal file contained the 1,251 unlawful surveillance images nor did he hand us any photo files even though he possessed the digital files with metadata which we did not have. Savur told my counsels that he would investigate the matter and revert. Savur waited almost three months to revert. During those three months, Savur did nothing to investigate the 1,251 unlawful surveillance images. Savur did not even hear the complaining witness, Buiter. Savur thus knowingly and willingly ran out the clock on me so any motion to vacate the ACD might come too late, i.e., after the ACD had expired (it generally takes a judge 6 weeks to consider a motion). When Savur finally did revert, he told my counsels that the DA's Office was not prepared to drop the charges but that we could come back if we had more evidence and that the ACD could still be undone and the charges dismissed in the interest of justice after the ACD had expired.

---

[1]     It defies belief that the defendants, who are all college-educated, did not understand 'female nudes' to refer to works of art.

32.    The Manhattan District Attorney made us file a FOIL-request, which we did in December 2014 and by which the Manhattan District Attorney's Office only complied 11 months later. The prosecution's obligation to disclose *Brady* evidence does not end with the adjournment of a case in contemplation of dismissal. *See People v. Wilson*, NY Slip Op 02106 (4th Dept., 2018) (rejecting the People's contention that the defendant forfeited his right to raise the alleged *Brady* violation by pleading guilty).

33.    I would never have accepted the ACD, which is not an adjudication of innocence, as an outcome had I known of the trove of unlawful surveillance images in the criminal file. With other words, I would not have accepted the ACD if I had known that I was the victim of the felony sex crime of unlawful surveillance in the second degree pursuant to New York Penal Law § 250.45 (1,251 counts) and the perpetrator used the spoils of his crime to have me arrested. But for Savur's assurance that the ACD could still be undone and the charges dismissed in the interest of justice after the ACD had expired, I would have moved to vacate the ACD before it expired.

34.    On May 8, 2016, my counsel sent a letter to District Attorney Cyrus Vance, demanding a dismissal of the charges against me in the interest of justice pursuant to Criminal Procedure Law § 210.40 based on the report by SBV Forensics, which is an adjudication of innocence. On May 23, 2016, we received a letter from Vance that Executive Assistant District Attorney Audrey Moore ("Moore") would investigate the matter. *See* Ex. G. In a meeting on July 8, 2016, with my counsels, Moore declined to investigate the matter.

35.    By letter of August 13, 2016, Moore declined to vacate the ACD and dismiss the charges in the interest of justice. *See* Ex. H. Moore's assertion that the ACD was a reasonable outcome shows that the People don't know their place. It's not their decision to make. A defendant must make the decision to accept an ACD as an outcome knowingly, voluntarily, and intelligently, none of which conditions were fulfilled here.

36.     All prosecutors in all cases have an obligation to deliver exculpatory and favorable information to the defense relevant to the issues of guilt and punishment. In *Brady v. Maryland*, where the evidence was relevant to the determination of punishment, the U.S. Supreme Court held that the turnover of the information is a requirement of due process. *Brady v. State of Maryland*, 373 U.S. 83 S. Ct. 1194; 10 L. Ed. 2d 215; 1963 at 86-89.  The Supreme Court also held that *Brady* disclosures must be made at the pre-plea stage. *See United States v. Ruiz*, 536 U.S. 622 (2002).

37.     New York State has set the rule with equal clarity. The Constitution's mandate is that evidence or information be given to the defense in a criminal case if it is favorable to the defense and it is either material to guilt or punishment or affects the credibility of prosecution witnesses whose testimony may be determinative of guilt or innocence. *People v. Santorelli*, 95 N.Y.2d 412 , 421 (2000), *cert. denied*, 532 U.S. 1008 (2001); *People v. Baxley*, 84 N.Y.2d 208, 212-14 (1994). "The concept of fairness embodied in the Due Process Clauses of the State and Federal Constitutions imposes upon the prosecution a duty to apprise the defense of evidence favorable to the accused. To give substance to this constitutional right, it is incumbent upon the prosecutor, who speaks for the government, to ensure that material evidence which is in its possession and is exculpatory in nature is turned over to the defendant. This duty of candor and disclosure is no less applicable when the evidence is relevant only to the issue of credibility." *People v. Novoa*, 70 N.Y.2d 490, 496 (1987) (citations omitted).

38.     *Brady* obligations apply whether there has been a defense request or not. *United States v. Agurs*, 427 U.S. 97 (1976).  The obligation of the prosecutor to turn over the information controls even if the prosecutor believes the information to be false. The obligation of the prosecutor applies to information relevant to the credibility of witnesses as well as to information relating to other matters in the case. *People v. Hunter*, 11 N.Y.3d 1 (2008); *People v. Valentin*, 1 A.D.3d 982 (4th Dept., 2003), *appeal denied*, 1 N.Y.3d 602 (2004).

39.     The obligation of the prosecutor exists whether the failure to deliver favorable information is intentional or not, or in good faith or not. *People v. Hunter*, 11 N.Y.3d 1 (2008); *People v. Bryce*, 88 N.Y.2d 124 (1996); *People v. Baxley*, 84 N.Y.2d 208.

40.     On January 24, 2018, my counsel moved the Manhattan Criminal Court to unseal my case, which was denied on February 24, 2018. *See* Ex. I.

41.     On  March 8, 2018, I petitoned the Manhattan Criminal Court writ of error *coram nobis* relief to vacate the ACD, which was denied on July 2, 2018. *See* Ex. J.

42.     On July 18, 2018, I moved the Manhattan Criminal Court pursuant to Criminal Procedure Law § 440.10(1)(h) to vacate the ACD, which was denied on October 30, 2018. *See* Ex. K.

43.     On November 29, 2018, I petitioned the Manhattan Critical Court for a second time for writ of *coram nobis* relief, which was denied on January 25, 2019. *See* Ex. L.

44.     While Judge Statsinger of the Manhattan Criminal Court acknowledged (compare Ex. J to K and L) that the defendants had willfully suppressed material exculpatory evidence that goes to my guilt or innocence or punishment, the motion and petition were denied because the ACD is not a conviction under New York law even though it is a conviction under federal statutes.

45.     In February 11, 2019, I moved the Appellate Term for leave to appeal from the order of the Manhattan Criminal Court, which was denied. *See* Ex. M. In April 2019, I moved the New York Court of Appeals for a criminal leave application, which was denied because the order of the Appellate Term is not an appealable decision. *See* Ex. N.

46.     A malicious prosecution claim is not available in New York State for criminal cases that were discontinued by way of an ACD. *See Eke v. City of New York*, 116 AD3d 403, 404 (1st Dept., 2014) (holding that because an "adjournment in contemplation of dismissal, being as un-adjudicative of innocence as it was of guilt, by its very nature operate(s) to bar recovery (for malicious prosecution)." ) Therefore, New York State does not have a meaningful post-deprivation remedy for

the violation of my rights under the Due Process Clause. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984).

47.     On November 8, 2017, Chief Justice Janet DiFiore issued a new rule requiring judges to order prosecutors to comb their files and disclose all evidence favorable to the defense at least 30 days before major criminal trials.[2] Prosecutors who ignore the court order may face contempt charges.

48.     The suppression of material exculpatory evidence by the prosecution is endemic in New York. A report by the New York Bar Association concluded that it is the leading cause of wrongful convictions.[3] This suffices to establish that the suppression of material exculpatory evidence is also a custom or practice in New York, at least it was in the for this case relevant time frame.

49.     Manhattan District Attorney Cyrus Vance tasked two members of his Executive Team (Nitin Savur and Audrey S. Moore) with the handling of my case, which suffices to establish that the suppression of material exculpatory evidence and the thwarting of defendants is a custom or practice in the Manhattan District Office.

50.     The actions of defendants violated my clearly established and well settled federal and state constitutional rights, including but not limited to the right to due process.

51.     At all relevant times, the defendants acted under color of state law as they were acting in their official capacity in the Manhattan District Attorney's Office and clothed with the authority of the state. *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980).

52.     The ACD is a conviction and an adjudication of guilt under federal statutes. *See, e.g., Smith v. Bank of Am. Corp.*, 865 F. Supp. 2d 298 (E.D.N.Y. 2012) (holding that Bank of America in New York correctly withdrew an offer of employment after an FBI-background check revealed that plaintiff had been charged with petit larceny even though the case was discontinued with an ACD).

53.     The Court of Appeals for the Second Circuit held in 2014 en banc that a plaintiff

---

[2]     Press release: http://ww2.nycourts.gov/sites/default/files/document/files/2018-05/PR17_17.pdf
[3]     Final Report of the New York State Bar Association's Task Force on Wrongful Convictions, April 4, 2009.

alleging civil rights violations in connection with her conviction must have access to a federal remedy under 42 U.S.C. § 1983. *See Poventud v. City of N.Y.*.

54.     As the ACD is a conviction under federal statutes, I was wrongfully convicted.

## LIABILITY OF THE CITY OF NEW YORK

55.     The violation of the right to due process, including but not limited to the suppression of material exculpatory evidence, is so persistent and widespread in New York City that it constitutes a custom or usage of which supervisory authorities must have been aware. A municipal custom, policy, or usage can be inferred from evidence of deliberate indifference of supervisory officials to such abuses. *See Iacovangelo v. Corr. Med. Care, Inc.*, No. 14-4157-cv, at \*5 (2d Cir. 2015).

56.     The suppression of material exculpatory evidence led to wrongful convictions in the cases of, e.g., Alan Newton, Lazaro Burt, Kerry Kotler, Douglas Warney, James Walker, Albert Ramos, George Whitmore, Lee Long, Betty Tyson, and Derrick Hamilton, and the unlawful detention of Kalief Browder.[4] These examples show a widespread practice among prosecutors to support reasonably the conclusion that the suppression of material exculpatory evidence is the custom in New York City and that supervisory personnel must have been aware of it. The aforementioned cases were highly publicized, which suffices to show a deliberate indifference on the part of supervisory personnel to the suppression of material exculpatory evidence, as it proves knowledge of this matter on the part of any supervisory personnel. *Id.*, at \*5-6.

---

[4]   For more cases, see, e.g., *People v. Hunter*, 11 N.Y3d 1 (2008); *People v. Williams*, 7 N.Y.3d 15 (2006); *People v. Pressley*, 91 N.Y.2d 825 (1997); *People v. Thompson*, 54 A.D.3d 975 (2d Dep't 2008); *People v. Phillips*, 55 A.D.3d 1145 (3d Dep't 2008); *People v. Colon*, 865 N.Y.S.2d 601 (1st Dep't 2008); *People v. Williams*, 50 A.D.3d 1177 (3d Dep't 2008); *People v. Garcia*, 46 A.D.3d 461 (1st Dep't 2007); *People v. Harris*, 35 A.D.3d 1197 (4th Dept. 2006); *People v. Leon*, 23 A.D.3d 1110 (4th Dep't), *appeal denied*, 6 N.Y.3d 755 (2005); *People v. Gantt*, 13 A.D.3d 204 (1st Dep't 2004), *appeal denied*, 4 N.Y.3d 798 (2005); *People v. Hendricks*, 4 A.D.3d 798 (4th Dep't), *appeal denied*, 2 N.Y.3d 800 (2004); *People v. Knight*, 2007 WL 4896695 (Supreme Ct. Queens Cty. 2007).

57.     The City of New York failed to properly train and supervise its prosecutors to ensure that similar constitutional violations would not be repeated, and this failure is the same training failure that led to my constitutional deprivations. *See Case v. City of N.Y.*, 233 F. Supp. 3d 372 (S.D.N.Y. 2017).

## DAMAGES

58.     As a direct and proximate result of the acts of defendants, I have suffered and continue to suffer the following injuries and damages:

 a.   Violation of my constitutional rights under the Fifth and Fourteenth Amendments to due process;

 b.   Loss of my physical liberty;

 c.   Loss of my livelihood;

 d.   Psychological injuries.

## PUNITIVE DAMAGES

59.     I am entitled to punitive damages with regard to all causes of action (*Smith v. Wade,* 461 U.S. 30, 103 S. Ct. 1625, 75 L. Ed. 2d 632 [1983]). The defendants engaged in a continuing and concerted campaign to deprive me of my constitutional right to due process under the Fifth and Fourteenth Amendment. The defendants' conduct was reckless or callously indifferent to my federally protected rights. The defendants acted intentionally and maliciously, with a deliberate intent to permanently harm me, out of ill-will and spite, and with willful and wanton disregard of my rights (*see Corrigan v. Bobbs- Merrill Co.*, 228 N.Y. 58, 126 N.E. 260 (1920)) or with such conscious disregard of my rights that it is deemed willful and wanton (*Fordham-Coleman v. Nat'l Fuel Gas Distribution Corp.*, 42 A.D.3d 106, 113 (4th Dept. 2007)).

## STATUTE OF LIMITATIONS

60.     The statute of limitations for my 42 U.S.C. § 1983 claims begins to run when I knew or had reason to know of the injury. *See United States v. Kubrick*, 444 U.S. 111 (1979). On March 9, 2015, I was unaware and had no reason to know of my injuries as I believed that the ACD could still be undone and the charges dismissed in the interest of justice after the ACD had expired because Savur had told my counsel so. I only became aware of my injury on August 13, 2016, when AEDA Moore wrote me a letter saying that the ACD could not be undone. My 42 U.S.C. § 1983 claims thus accrued the earliest on August 13, 2016, pursuant to *United States v. Kubrick*.

61.     Whether a 42 U.S.C. § 1983 claim is tolled is a matter of state law. *See Board of Regents v. Tomanio*, 446 U.S. 478 (1980). New York State has generous tolling and saving statutes, expressing a strong desire to decide cases on their merits. A state savings statute stops the running of the applicable limitations period for claims timely filed but subsequently dismissed for improper venue, for want of jurisdiction or for other reasons not related to the merits. My 42 U.S.C. § 1983 claims are saved under New York Civil Practice Law and Rules §§ 203(b), (f), and 205(a) because the defendants are united in interest and I challenged the validity of the ACD within three years after March 9, 2015, i.e., on January 24, 2018.

62.     The continuing tort doctrine permits claims based on wrongful conduct outside the statute of limitations so long as the final actionable event occurred within the statute of limitations of the suit (*Shannon v. MTA Metro–N. R.R.*,269 A.D.2d 218, 219, 704 N.Y.S.2d 208 ; *see Mintz & Gold, LLP v. Zimmerman*,71 A.D.3d 600, 601, 898 N.Y.S.2d 116 ; cf. *Misek–Falkoff v. International Bus. Machs. Corp.*,162 A.D.2d 211, 211, 556 N.Y.S.2d 331 ; *Weisman v. Weisman*,108 A.D.2d 853, 854, 485 N.Y.S.2d 570 ).” *See Estreicher v. Oner*, 49 N.Y.S.3d 530, 532 (2nd Dept., 2017).

63.     My claims are also equitably tolled until at least August 13, 2016. *See Kiernan*, 619 N.Y.S.2d at 724.

**AS AND FOR A FIRST CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**42 U.S.C. § 1983**

64.     I repeat and reallege the factual allegations contained in paragraphs numbered "1"

through "63" as if fully set forth herein.

65.     Defendants, acting under color of State Law, deprived me of my rights secured by the

United States Constitution by engaging in a course of conduct rising to the level of a policy and

practice, thereby violating my civil rights under 42 U.S.C. § 1983.

66.     Plaintiff, therefore, seeks declaratory judgment that the decision and order of Judge

Statsinger of March 10, 2014, for an Adjournment in Contemplation of Dismissal in *People v. Heleen*

*Mees* (Index No. 2013NY050589) pursuant to Criminal Procedure Law § 170.55 is vacated.

**AS AND FOR A SECOND CAUSE OF ACTION**
**AGAINST VANCE, SAVUR, LAUNAY, AND SCHOTT**
**42 U.S.C. § 1983**

67.     I repeat and reallege the factual allegations contained in paragraphs numbered "1"

through "66" as if fully set forth herein.

68.     Schott was the prosecutor handling my case and Launay supervised her. As my arrest

was highly publicized and Buiter is the chief-economist of Citigroup Inc., Vance and his executive

team were involved in the decision-making on my prosecution from the beginning.

69.     Buiter handed the prosecution about 1200 unlawful surveillance images both in hard

copy as well as in digital format. The images were easily identifiable as unlawful surveillance images,

especially for Launay and Schott, who both work in the vaunted Special Victims Bureau.

70.     As the superseding accusatory instrument of August 5, 2013, no longer alleged that I

sent Buiter 'naked pictures' of myself, I did not know nor should I have known that the criminal file

contained about 1200 unlawful surveillance images of me.

71.     During plea discussions in February 20014, Launay and Schott did not disclose to my attorneys, Ira London and Olav Haazen, that the criminal file contained about 1200 unlawful surveillance images of me even though they knew the images to be exculpatory.

72.     When I consented to the ACD on March 10, 2014, I did not know nor should I have known that the criminal file contained about 1200 unlawful surveillance images of me, which were exculpatory. The defendants thus obtained the ACD in violation of my rights under the United States Constitution.

73.     When my counsels sent a letter to Vance on October 28, 2014, Vance tasked a member of his Executive Team, Savur, to set up a meeting with my counsels. Vance was thus directly involved in his office's handling of the matters raised by us in the letter of October 28, 2014.

74.     On November 26, 2014, my counsels, Olav Haazen and Brooke Alexander, met with Savur. During that meeting, Savur told them that he would investigate the matters raised in our letter of October 28, 2014, and get back to us.

75.     Savur suppressed the metadata of the image files, which we did not have.

76.     Savur waited almost three months, i.e., until February 10, 2015, to inform my counsels in a conference call, which included Schott, that the District Attorney's office was not prepared to drop the charges. During the phone call on February 10, 2015, Savur reassured my counsels that we could come back if we had more evidence and that the case could still be reopened after the ACD had expired and the charges dismissed in the interest of justice.

77.     The defendants deliberately thwarted me by running out the clock on me and telling my counsels that the ACD could still be undone after it had expired.

78.     I would never have accepted the ACD, which is not an adjudication of innocence, as an outcome if I had known of the trove of unlawful surveillance images in the criminal file.

79.     I would not have let the ACD expire if I had known that the ACD could not be undone and the charges dismissed in the interest of justice after the ACD had expired.

80.     The defendants engaged in a continuing and concerted campaign to deprive me of my constitutional right to due process under the Fifth and Fourteenth Amendment.

81.     The suppression of material exculpatory evidence by the prosecution occurs so frequently in New York City that it rises to the level of a policy and practice.

82.     Defendants, acting under color of State Law, deprived me of my rights secured by the United States Constitution by engaging in a course of conduct rising to the level of a policy and practice, thereby violating my civil rights under 42 U.S.C. § 1983.

83.     I claim damages under 42 U.S.C. § 1983 for the injuries set forth above against defendants Vance, Savur, Launay, and Schott for violating my constitutional rights under color of law.

## AS AND FOR A THIRD CAUSE OF ACTION
## AGAINST THE CITY OF NEW YORK
## 42 U.S.C. § 1983

84.     I repeat and reallege the factual allegations contained in paragraphs numbered "1" through "83" as if fully set forth herein.

85.     Prior to March 10, 2015, the Manhattan District Attorney's Office developed and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of persons in the City of New York, which caused the violation of my rights.

86.     It was the policy and/or custom of the Manhattan District Attorney's Office to fail to exercise reasonable care in hiring and retaining its prosecutors, including defendants Savur, Launay, and Schott, thereby failing to adequately prevent constitutional violations on the part of its prosecutors.

87.     It was the policy and/or custom of the Manhattan District Attorney's Office to inadequately supervise and train its prosecutors, including defendants Vance, Savur, Launay, and

Schott, thereby failing to adequately discourage further constitutional violations on the part of its prosecutors.

88.     As a result of the above described policies and customs, prosecutors of the City of New York, including defendants Vance, Savur, Launay, and Schott, believed that their actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but would be tolerated.

89.     The above described policies and customs demonstrate a deliberate indifference on the part of the City of New York to the constitutional rights of persons within the City of New York, and were the cause of the violations of my rights alleged herein.

## DEMAND FOR RELIEF

WHEREFORE, I respectfully request this Court:

A.  Enter judgment in my favor against the defendants;

B.  Enter an order declaring defendants Vance, Savur, Launay, and Schott's conduct unconstitutional;

C.  Enter an order vacating the order of March 10, 2014, in *People v. Heleen Mees* (Index No. 2013NY050589);

D.  Award me compensatory damages of Ten ($10,000,000) million dollars against each defendant;

E.  Award me punitive damages against defendants;

F.  Enter a permanent injunction, upon proper motion, requiring defendant City of New York to adopt appropriate policies related to the hiring and supervision of prosecutors; and

G.  Grant any other relief it deems just and equitable.

## **<u>JURY DEMAND</u>**

Plaintiff respectfully requests a jury trial as to all issues so triable.


Dated: January 10, 2020
        Amsterdam, The Netherlands

*Heleen Mees s/*
_____
Dr. Heleen Mees
Plaintiff *Pro Se*