# EXHIBIT C

# B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

333 MAIN STREET* ARMONK, NY 10504* 914-749-8200* FAX 914-749-8300

October 28, 2014

Cyrus R. Vance, Jr., District Attorney
The New York County District Attorney's Office
One Hogan Place
New York, New York 10013

Re:     *The People of the State of New York v. Heleen Mees*,
          No. 2013NY050589 (N.Y.C. Crim. Ct.)

Dear Mr. Vance:

We represent Dr. Heleen Mees, a former New York University economics professor, political commentator, lobbyist, and public figure in her country of origin, the Netherlands, who is being prosecuted by your Office for second-degree menacing, third- and fourth-degree stalking, second-degree harassment, and second-degree aggravated harassment.  *See* Pen. L. §§ 120.14(2), 120.45(2), 120.50(3), 240.26, and 240.30(1)(a).  We write to advise you that further prosecution of this matter would be unconstitutional and a violation of international law.  We have also discovered new evidence that suggests that the purported "victim" dramatically misled your Office and may have fabricated and tampered with evidence.  We respectfully request that you exercise your prosecutorial discretion to withdraw all misdemeanor charges and immediately terminate the prosecution of our client, without unnecessary motion practice.  We do so for three reasons.[1]

*First*, all but three of the factual allegations against our client concern pure speech acts of the kind that the Court of Appeals has now definitively held are protected by the state and federal constitutions, and cannot be criminalized or prosecuted.  Whatever the state of the law prior to the Court of Appeals' rulings, the People are now on notice that the continued prosecution for Mees' acts of pure speech is improper.[2]

*Second*, two of the three additional factual allegations involve conduct in foreign nations, to wit alleged attempted encounters in the Netherlands and China.  These extraterritorial acts not only fall outside your Office's prosecutorial jurisdiction, they were, in fact, *legal* in the jurisdictions where they were allegedly committed.  To prosecute our client for such acts is a violation of international law, as well as federal and state law, including well-established conflict

---

[1] While this matter was adjourned for 1 year in contemplation of dismissal on March 10, 2014, our client continues to suffer the severe consequences of the pendency of this case, including because her accuser continues to make false accusations about her, which create the risk that the active prosecution could be reopened.  *See infra*, § II.

[2] The statutes are also unconstitutional *as applied*:  the communications for which our client, a lobbyist and political commentator, is prosecuted contain at least 30 acts of political speech in its purest form.  *See* **Ex. 1**.

Cyrus R. Vance, Esq.
October 28, 2014
Page 2 of 17

of law rules.  (The third non-speech allegation is on triple-hearsay, which has no place in an Information).

*Third*, as we previously demonstrated to Assistant District Attorney Samantha Schott, the criminal complaint and the accusatory instrument are riddled with false statements by the accuser, Prof. Willem Buiter.  His credibility is now so shattered that the prosecution cannot win this case at trial.  While the falsehoods were sufficient reason for your Office to offer the ACD, Ms. Schott refuses to drop the charges altogether—even though we advised her of significant *additional* exculpatory evidence *after* the ACD was entered, including an email showing that the encounter in China was, in fact, pre-arranged and evidence that the nude photos that Mees supposedly sent were in reality screenshots that *Buiter* took of Skype calls in which he voluntarily participated.  We refer to additional instances where the accuser demonstrably misled your Office and fabricated incriminating evidence in § V below.

Because the People appear to have been misled into prosecuting this case (and the police into arresting our client) by a slew of false and misleading statements by the accuser, we fail to see why your Office would want to proceed with this case.  The People gain very little by keeping this matter open until March 9, 2015 or insisting on the ACD.  Mees completed all 14 counseling sessions that your Office believed desirable and the Court imposed.  She also has absolutely no intention of contacting the accuser ever again.  What is left is a classic obey-the-law injunction.  Such injunctions are generally recognized to have limited utility because they "do not require the defendants to do anything more than that already imposed by law."  *Rowe v. N.Y. State Div. of the Budget*, 2012 WL 4092856, at *7 (N.D.N.Y. Sept. 17, 2012).

## I.   **Background**

Our client, then-professor Heleen Mees, was arrested and charged with various counts of stalking and harassment on July 1, 2013, based on a complaint by fellow economics professor and chief economist of Citigroup, Willem Buiter.  *See* **Ex. 2**.  Buiter apparently told the police that the two of them once had a short relationship and that Mees has since stalked and harassed him for several years.  **Ex. 3** at 2.  Buiter apparently did not advise the police, or your Office, that in reality their consensual sexual relationship had lasted *four* years, and that the two had only *recently* broken up.  He claimed that Mees had harassed him by sending thousands of emails (**Ex. 2** at 2; **Ex. 3** at 2), but omitted that Mees' emails were part of the regular email exchange between the two lovers during those years, during which Buiter also sent Mees some 1,000 messages.  He apparently also did not tell the police that he had only just moved to New York City, and that everything that allegedly occurred in the years preceding his move, including the bulk of the email exchanges, occurred in other countries before Buiter had any connection whatsoever with New York.  Buiter represented that Mees also harassed his children by email, and that he feared for their safety.  **Ex. 2** at 2.  He apparently did not advise the police or your Office that his "children" are, in fact, grown-ups in their twenties, who do not live, and never lived, in the State of New York, and that Mees never met them, or sent them even a *single* email.

The Information that ADA Schott issued on August 5, 2013, charges Mees with five misdemeanors based on three categories of allegations:

Cyrus R. Vance, Esq.
October 28, 2014
Page 3 of 17

    (i)     allegations that Mees sent Buiter 3,000 emails in four years, and 164 Facebook messages, and that she called his cell phone hundreds of times (the "**Speech Act Allegations**");

    (ii)    allegations that the content of certain messages was annoying and threatening, including sexually explicit messages ("Shall I lick your b---s?"), emails asking if he would "meet her for a drink," artwork of two little dead birds, an angry email stating "I hope you die," and a message after Buiter's flight to London took off "I hope your plane falls from the sky"—a message she retracted five minutes later and Buiter *cannot* have read until he landed on foreign soil (the "**Speech Content Allegations**"); and

    (iii)   allegations that in "May 2010, the defendant tried to meet with [Buiter] at [his] hotel in Beijing, China," that "in January 2013, the defendant tried to meet [him] at [his] hotel in Amsterdam, The Netherlands, by using a fake name," and that on "May 6, 2013, the defendant came to [Buiter's] apartment building in the County and State of New York, and tried to be let up . . ." (the "**Conduct Allegations**").

**Ex. 3** at 2.

On February 4, 2014, counsel met with ADA Schott and her supervisor, Jeanine Launay, to walk them through documentary evidence showing significant falsehoods in Buiter's statements in the July 1 complaint and August 5 Information, and the details of Buiter's four-year relationship with Mees, the frequent initiative *Buiter* took to contact Mees, and his own sexually explicit messages. Following that meeting, your Office offered Mees a one-year ACD. Eager to avoid a public trial, primarily for financial reasons and to avoid further reputational and emotional harm, Mees consented to the ACD, which was entered by Justice Steven Statsinger on March 10, 2014.

## II.   The Continuing Threat of Prosecution and Enduring Effects on Mees

Since the ACD, Mees has continued to suffer the consequences of her arrest and prosecution, and she continues to live under a threat of further prosecution. In fact, the past months have shown that the particularities of this case—an accuser engaged in *continuing* false statements and a public figure whose arrest and prosecution became a veritable media hype—prevent Mees from enjoying the benefits normally associated with ACDs.

The purpose of an ACD is "to provide a shield against the criminal stigma" that would otherwise attach to a defendant. *Lancaster v. Kindor*, 471 N.Y.S.2d 573, 579 (1st Dep't 1984); *accord Smith v. Bank of Am. Corp.*, 865 F. Supp. 2d 298, 302 (E.D.N.Y. 2012) (Weinstein, J.) (ACD designed to avoid persons charged with minor offenses being permanently designated as criminals). When granted an ACD, a defendant "is 'entitled to the full benefit of the record sealing and expunging provisions' that attend an acquittal." *Rothstein v. Carriere*, 373 F.3d 275, 287 (2d Cir. 2004) (quoting *Hollender v. Trump Village Co-op, Inc.*, 58 N.Y.2d 420 (1983)). The defendant shall be restored "to the status he occupied before his arrest and prosecution."

Cyrus R. Vance, Esq.
October 28, 2014
Page 4 of 17

CPL § 170.55(8). The ACD statute specifically provides that "[n]o person shall suffer any disability as a result" of an ACD. *Id.* "The over-all effect of a consummated ACOD dismissal is then to treat the charge *as though it never had been brought*." *Hollender*, 58 N.Y.2d at 425 (emphasis added).

Our client will likely be deprived of all the above benefits to which she is supposed to be entitled. She lost her NYU professorship, her job as a newspaper columnist, and all of her lobbying and consulting business. While the courts recognize that the "ability to earn a living is an important factor in avoiding criminality" through an ACD, *Smith*, 865 F. Supp. 2d at 300, the public airing of Mees' private and intimate conversation with Buiter and the public ridicule that followed her arrest and prosecution make it virtually impossible for her to earn a living as an economics professor, political lobbyist, commentator, or public speaker. She clearly suffers, and will continue to suffer, a "disability as a result" of the prosecution. Because the news of her arrest and prosecution was reported around the globe and every detail of the accusations against her is preserved on hundreds of websites, this ACD is not sufficient to return her to a state as though the prosecution "never had been brought." The "full benefit" of sealing and expunging the record will hardly make Mees' arrest and prosecution a "nullity." Nor is the ACD in any way sufficient to restore her previous status.

These consequences are understandable, and could even be justifiable, if Mees' actions, here and abroad, could actually be prosecuted here, and if the statements that Buiter "spiced up" in order to convince the police and your Office and to entice the media around the world, were true. But for the reasons below, this is *not* the case.

### III.   Continued Prosecution of Mees for Her Pure Speech Acts Is Improper.

Our client cannot, and should not, be subjected to these consequences on account of what are acts of protected speech (the **Speech Act Allegations** and the **Speech Content Allegations**). As you are aware, earlier this year, the Court of Appeals struck down the second-degree aggravated harassment statute (Pen. L. § 240.30(1)(a)) as unconstitutional under both the state and federal constitutions. *See People v. Golb*, 991 N.Y.S.2d 792 (2014). The court held that the criminalization of communicating with "intent to annoy" another person is a "proscription of pure speech" that goes beyond the constitutionally necessary limitations to "words which, by their utterance alone, inflict injury or tend naturally to evoke immediate violence." *Id.* (quoting *People v. Dietze*, 75 N.Y.2d 47 (1989)). It also held that it is unconstitutionally vague and overbroad to prohibit communicating "in a manner likely to cause annoyance or alarm" to another person. *Id.* (quoting *People v. Dupont*, 486 N.Y.S.2d 169 (1st Dep't 1985)). Thus, speech cannot constitutionally be prohibited just because it is annoying, whether the speech acts are, or are intended to be, annoying because of their content or their quantity and frequency.

### A.   The Stalking, Harassment, and Menacing Statutes At Issue Here Are Unconstitutional on Their Face.

The ruling in *Golb* affects all five statutes under which our client is prosecuted. Section 240.30(1)(a) (aggravated second-degree harassment) is unconstitutional on its face because it

Cyrus R. Vance, Esq.
October 28, 2014
Page 5 of 17

criminalizes communicating with "intent to annoy" another person, and thus proscribes pure speech in a manner that goes beyond the constitutionally necessary limitations to "words which, by their utterance alone, inflict injury or tend naturally to evoke immediate violence." *Golb*, 991 N.Y.S.2d at 800; *accord People v. Marquan M.*, 24 N.Y.3d 1 (2014) (cyberbullying statute unconstitutional on its face because it broadly prohibited all communications that are meant to harass or annoy a person).

By the same token, Sections 240.26(3) (second-degree harassment), 120.50(3) (third-degree stalking), 120.45(2) (fourth-degree stalking), and 120.14(2) (menacing)—all of which are capable of encompassing protected speech—are unconstitutionally vague and overbroad.  With the exception of Section 120.45(2), *none* of these statutes limit themselves to speech acts that "by their utterance alone, inflict injury. . ."  Sections 240.26(3) and 120.50(3) both criminalize an "annoying course of conduct" that a defendant engages in "with intent to harass, annoy or alarm" another person, if the conduct serves "no legitimate purpose" (§ 240.26(3)) or "is likely to cause reasonable fear of injury" (§ 120.50(3)). Section 120.45(2) similarly criminalizes communicating with a person or his family if these communications serve "no legitimate purpose" and also cause material mental or emotional harm, and Section 120.14(2) criminalizes engaging in a course of conduct "intentionally placing another person in reasonable fear of injury."  The case law is clear that in order to pass constitutional muster, criminal prohibitions must carve out constitutionally protected speech from the conduct or speech that their broad language otherwise would cover. *See Dietze*, 75 N.Y.2d at 50 (even when certain conduct could be proscribed without violating the Constitution, on their face, these statutes prohibit "a substantial amount of constitutionally protected expression," which requires that they be stricken); *People v. Pierre-Louis*, 927 N.Y.S.2d 592, 595-97 (Dist. Ct. Nassau Cnty. 2011) (vagueness and overbreadth of statute that fails to distinguish between protected versus unprotected speech is "readily apparent").

None of the above statutes, however, provides for a valid carve-out.  *None* of the qualifiers that these statutes added—that the communication is prohibited only if it is without legitimate purpose or threatens someone with injury—are sufficient to salvage these prohibitions of speech from constitutional infirmity.  As the Court of Appeals made clear in *Marquan* earlier this year, "the First Amendment *forbids* the government from deciding whether protected speech qualifies as 'legitimate . . .'" *Marquan*, 24 N.Y.3d at 7 (emphasis added); *accord Simon & Schuster, Inc. v. Members of the N.Y.S. Crime Victims Bd.*, 502 U.S. 105, 116 (1991) ("Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment.").  Because of this overbreadth, each of these statutes is capable of covering (and, in fact, covers) speech acts that *cannot* constitutionally be proscribed, including purely political or potentially annoying yet non-threatening speech.

**B.      The Stalking, Harassment, and Menacing Statutes At Issue Here Are Also Unconstitutional As Applied**.

State and federal precedents make clear that continuing this prosecution under the specific circumstances of this case would be unconstitutional.  Because the U.S. and New York Constitutions do not permit any proscription of pure speech beyond "words which, by their utterance alone, inflict injury or tend naturally to evoke immediate violence," *Golb*, 991

Cyrus R. Vance, Esq.
October 28, 2014
Page 6 of 17

N.Y.S.2d at 800, the **Speech Content Allegations** and the **Speech Act Allegations** at issue here would, at a minimum, need to have amounted to *threats*.  Clearly, they do not.

> ### 1.    The Speech Content Allegations

A proscribable "true threat" requires "a serious expression of an intent to *commit* an act of *unlawful violence.*"  *People v. Bonitto*, 777 N.Y.S.2d 900, 902 (N.Y.C. Crim. Ct. 2004) (emphasis added) (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)); *accord Vives v. City of N.Y.*, 305 F. Supp. 2d 289, 298-99 (S.D.N.Y. 2003).  Thus, stating to an abortion clinic doctor after the murder of another doctor "I hope you're next" is not constitutionally proscribable because it is not a true threat of any immediate action by the speaker himself.  *New York v. Operation Rescue National*, 273 F.3d 184, 196-97 & n. 5 (2d Cir. 2001).  By the same token, statements like "I hope you die" or "I hope your plane falls from the sky," sending artwork of dead birds, or even tweeting to the world (from Austin, Texas) that one is a "natural" at the shooting range—even if those statements could have the meaning that Buiter claims he thought they had—are not true threats. Wishing someone bad fortune or even death cannot constitutionally be considered a crime because these are not direct threats of some specific action that the speaker intends to do.[3]

Even actual threats directed at the victim, and those made "in a very menacing manner," *People v. Digianni*, 2010 WL 1542527, at *5 (Just. Ct. New Castle March 11, 2010), cannot be criminally proscribed unless the threat is *imminent*.  *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) (speech must have tendency "to incite an immediate breach of the peace"); *New York ex rel. Spitzer v. Cain*, 418 F. Supp. 2d 457, 477 (S.D.N.Y. 2006) (statements like "Go to hell" and "I'd like to stick a coat hanger in you" do not "indicate the unequivocal immediacy and express intention of a true threat"); *Dietze*, 75 N.Y.2d at 51-53 (first-degree harassment charge dismissed because threat to "beat the crap out of [the complainant] some day or night on the street" does not create an imminent danger of violence, and thus does not fall within the scope of constitutionally proscribable speech).[4]

Threats must also be unequivocal and specific.  *Behlin*, 863 N.Y.S.2d at 365-66 (defendant's threat that he "was going to get her" and she should better "watch it" not specific as to the harm, time or place, and therefore not harassment); *Digianni*, 2010 WL 1542527, at *5, *7

---

[3]  *Accord People v. Khaimov*, 906 N.Y.S.2d 782 (N.Y.C. Crim. Ct. 2009) (warning to "[w]atch your step or something serious is going to happen to you," stating no specific harm, time or place of occurrence, is not unequivocally threatening); *People v. Bender*, 2007 WL 258290, at *4 (N.Y.C. Crim. Ct. Jan. 31, 2007) (without threats of violence or harm, rude or angry words are not enough to constitute aggravated harassment) (quoting *People v. Webers*, 808 N.Y.S.2d 920 (1st Dep't 2005)); *Pierre-Louis*, 927 N.Y.S.2d at 595 ("I'm coming at you with fury" too vague to be a true threat).

[4]  *See also People v. Behlin*, 863 N.Y.S.2d 362, 366 (N.Y.C. Crim. Ct. 2008) (actionable threats require "immediacy," *i.e.* some "ultimatum threatening a specific type of harm which would befall the complainant at a predetermined time or place in the near future"); *People v. Limage*, 851 N.Y.S.2d 852, 856 (N.Y.C. Crim. Ct. 2008) (actionable threats require a "sense of imminence, rather than some abstract notion of what might happen at an unspecified later time").

Cyrus R. Vance, Esq.
October 28, 2014
Page 7 of 17

(phone message "I'm going to get you," not in close proximity to the victim or with knowledge of the victim's whereabouts lacked requisite "sense of imminence"); *accord People v. Yablov*, 706 N.Y.S.2d 591, 595-96 (N.Y.C. Crim. Ct. 2000) ("we'll get you").

Under these precedents, the **Speech Content Allegations** do not suggests any proscribable true threats. In light of countless examples in the case law that held insufficiently threatening far more serious statements like "I will beat the crap out of you" (*Dietze*), "I'd like to stick a coat hanger in you" (*Cain*), and "we'll get you" (*Yablov*), there is no chance that a judge (or, if necessary, a jury) will find Mees wishing Buiter misfortune (including a message she had retracted before Buiter even read it) threatening speech.[5] Angry expressions of the drop-dead and go-to-hell type are not threats. The fact that Mees emailed these statements, rather than telling Buiter face-to-face, and the dates of her purported "death wishes"—September 14-15, 2012, *i.e.* long before Buiter moved to New York—conclusively establish that there was no imminence or proximity either in time or place. The idea that Buiter, a hyper-intelligent and level-headed man, *genuinely* believed that a 43-year old economics scholar from Brooklyn would have the capability of making planes "fall from the sky" is ludicrous.

The sexual explicitness of Mees' messages—in a tone comparable to Buiter's own profanity toward Mees (*see* **Ex. 5**)—and images of nude women—about which Buiter commented to Mees "Pictures like that of yourself are always welcome" (**Ex. 6**)—cannot possibly be grounds for prosecution in the absence of any threat. *See Dietze*, 75 N.Y.2d at 51 (unless speech presents a clear and present danger of some serious substantive evil, even provocative and vulgar speech "may neither be forbidden nor penalized"); *Bonitto*, 777 N.Y.S.2d at 90-3 (a prisoner's letter from his prison address to a random person, requesting contact and a response and stating he hoped he "may get lucky," but without any threat of violence was, while "unsettling," "incapable of constituting a true threat, as a matter of law" and did not amount to either harassment or a threat).

### 2. The Speech Act Allegations

The **Speech Act Allegations**, which accuse our client of sending 3,000 emails in four years, sending 164 Facebook messages, and making hundreds of unanswered cell phone calls, cannot form the basis of Mees' further prosecution. It is obvious that constitutionally protected speech does not lose its protection just because a person chooses to exercise his or her constitutional right with high frequency. *See Yablov*, 706 N.Y.S.2d at 596 ("[V]olume of telephone calls alone does not constitute a violation of [Section 240.26]."). *Without a specific threat*, even a barrage of messages cannot constitutionally be proscribed as harassment or aggravated harassment. *Id.* at 595-6; *see Bender*, 2007 WL 258290, at *4 (without threats of violence or harm, no aggravated harassment).

---

[5] Whether a communication is a true threat rather than protected speech is "a threshold question of law for the court." *Behlin*, 863 N.Y.S.2d at 365 n. 1; *accord People v. Thompson*, 905 N.Y.S.2d 449, 496 (N.Y.C. Crim. Ct. 2010). Mees' "I hope you die" email is no worse than what Buiter had to say to Mees: "Life sucks, then you die." *See* **Ex. 4**.

Cyrus R. Vance, Esq.
October 28, 2014
Page 8 of 17

This is, of course, most obvious for the "hundreds" unanswered phone calls Mees allegedly made to Buiter.  Unanswered phone calls cannot be threats, as they cannot, by definition, have a threatening content (or any content at all).  *Yablov*, 706 N.Y.S.2d at 595 (no second-degree aggravated harassment where defendant called 22 times but left no messages and thus made no specific threat).  Such phone calls also cannot form the basis of a second-degree harassment (§ 240.26(3)) or fourth-degree stalking (§ 120.45(2)) charge because both of these misdemeanors require that the Information provide factual allegations from which to discern *the absence of a legitimate purpose* as a necessary element of the charges.  *See People v. Goris*, 975 N.Y.S.2d 368 (N.Y.C. Crim. Ct. 2013).  Allegations of phone calls that were not completed and therefore have no content do not show on their face for what purpose the defendant was trying to speak with the person.  By definition, they "do not demonstrate that the communication was made with lack of legitimate purpose." *Id*.

The same rationale applies to the 3,000 emails and 164 Facebook messages Mees allegedly sent.  Criminalization of speech acts based solely on their volume, without regard to content, is plainly overbroad, as it indiscriminately lumps together both protected and unprotected speech.  *Pierre-Louis*, 927 N.Y.S.2d at 595-97.  There may be no better example of the impropriety of that approach than the case at bar. Mees is a political and economic commentator, who frequently engaged in political discussion with Buiter, including during the 2009-2013 period.   A sampling of pure political speech that was part of the volume of communications that your Office has included as predicate acts is attached as **Ex. 1**.[6]  Prosecuting Mees for the totality of her communications with Buiter necessarily penalizes her for engaging in such pure political speech.  *See People v. Mangano*, 100 N.Y.2d 569, 571 (2003) (repeated messages that include complaints about government actions, no matter how harassing, crude, or offensive, do not fall "within any of the proscribable class of speech or conduct").

    *3.*    *Re-characterizing Speech Acts as "Conduct" Does Not Make this Prosecution Constitutional.*

We are aware that Sections 240.26(3) (second-degree harassment), 120.50(3) (third-degree stalking), and 120.14(2) (menacing) all purport to criminalize a "course of conduct," not specifically communications, and that several courts, including the Court of Appeals and Justice Statsinger, have upheld similar statutes on a theory that threatening conduct is not protected speech.  *See People v. Shack*, 86 N.Y.2d 529 (1995); *People v. Seitz*, 2014 WL 4358402, at *3 (N.Y.C. Crim. Ct. Sept. 4, 2014) (Statsinger, J.) (distinguishing impermissible prohibition of pure speech from permissible criminalization of conduct, of which speech may be a component) (citing *Shack*). But *Seitz* was plainly wrongly decided. Whether the government labels its prosecution of constitutionally protected speech as the criminalization of "conduct" or "speech" is irrelevant.   A statute is overbroad as long as its prohibition of "conduct" reaches

---

[6] *See, e.g.*, Email dated November 26, 2012 (Mees' political column regarding debt forgiveness), December 9, 2012 (Mees' column regarding the innovation crisis), December 13, 2012 (Mees' Financial Times blog post regarding economic growth), December 17, 2012 (column regarding gun control in U.S. politics), January 31, 2013 (Financial Times blog regarding Fitch), February 23, 2013 (draft New York Times OpEd piece regarding low yields and large bubbles), March 1, 2013 (Financial Times blog post regarding interest rates), April 7, 2013 (requesting Buiter's comments on column on housing bubbles), April 9, 2013 (Project Syndicate blog post regarding transatlantic strife).

Cyrus R. Vance, Esq.
October 28, 2014
Page 9 of 17

constitutionally protected speech, such as the making of phone calls or sending unwanted mail. *See Mangano*, 100 N.Y.2d at 571; *Vives*, 305 F. Supp. 2d at 301 (criticizing New York police and prosecutors for continuing to arrest and prosecute people "for engaging in *conduct* that is firmly protected by the First Amendment") (emphasis added); *Thompson*, 905 N.Y.S.2d at 459 (statutory reference to proscribed "conduct" sufficient to cover certain types of speech).

*Shack* does not survive the Court of Appeals' recent holding in *Marquan*, which held an anti-bullying statute unconstitutional because it was *capable* of covering acts of pure speech. *Marquan*, 24 N.Y.3d at 6, 8.  In *Shack*, the Court of Appeals held that Section 240.30(2) (second-degree aggravated harassment) does not unconstitutionally reach protected speech because its reference to "conduct" expressly excludes such speech by making an exception for telephone calls for the "purpose of legitimate communication."  86 N.Y.2d at 533, 535; *id.* at 537. That reasoning no longer works, however, because the Court of Appeals no longer considers it permissible to use such a carve-out to save the statute from constitutional infirmity. *Marquan*, 24 N.Y.3d at 7 ("the First Amendment *forbids* the government from deciding whether protected speech qualifies as 'legitimate . . .'") (emphasis added).[7]

Now that the practice of prosecuting people for speech that is annoying (*Golb*), serves "no legitimate purpose" (*Marquan*), or consists of high-volume repetitive messages that contain government criticism (*Mangano*) have been declared unconstitutional, the only appropriate course of action is to discontinue this prosecution.  We see no reason why your Office, having been misled into prosecuting this case, would want to ratify Buiter's actions and, having been advised of its constitutional and factual infirmity in light of pre-existing law, make its own independent decision to continue to prosecute this matter.

## IV. The Exercise of Extraterritorial Jurisdiction in this Case Violates State, Federal, and International Law.

A second reason why the continued prosecution of our client is inappropriate is the extraterritorial nature of the conduct on which the **Conduct Allegations** are based.   The Information alleges that in January 2013, Mees tried to meet with Buiter in his hotel in Amsterdam, the Netherlands, and that three years earlier, in 2010, she had done the same in

---

[7] Similarly, *Shack*'s alternative rationale does not survive the Court of Appeals' decision in *Golb*.  *Shack* held that a telephone is like a mailbox and that people should be able to refuse unwanted mail from trespassers delivering it to their homes. 86 N.Y.2d at 535-36.  Unlike the delivery of unwanted mail to "a private place" (*id.*), however, calling someone, leaving voice or text messages, and sending emails are *not* a form of trespass.  *See Pierre-Louis*, 927 N.Y.S.2d at 597) ("[M]aking a phone call, even uninvited to an individual is not a trespass.").  The *Golb* Court cited with approval Judge Scheindlin's decision in *Vives v. City of N.Y.*, 305 F. Supp. 2d 289 (S.D.N.Y. 2003); *see Golb*, 991 N.Y.S.2d at 800.  *Vives* recognized that Americans in the Information Age are "bombarded daily" with large volumes of annoying communications, including "email boxes filled with spam" and "prerecorded advertisements left on telephone answering machines."  305 F. Supp. 2d at 292-93.  Neither the fact that such communications annoy and/or alarm the recipients, nor that they are intended to do so, "can be a basis for arresting or prosecuting" anyone (*id.* at 299)—under a trespass theory or otherwise.

Cyrus R. Vance, Esq.
October 28, 2014
Page 10 of 17

Beijing, China.[8]  It is undisputed that Mees is a Dutch national, and that in January 2013, Buiter lived in London and that he did not move to New York until mid-February or later.  Thus, it is clear that your Office is prosecuting a Dutch national for conduct that allegedly occurred in her own country, as well as in China, where that conduct is not prohibited, while the victim was not even a New York resident.  The continued exercise of extraterritorial prosecutorial jurisdiction is highly improper and, in fact, violates well-established state, federal, and international law.[9]

## A.    The Present Prosecution for Extraterritorial Conduct Violates State Law.

The DA's Office has no authority to prosecute Mees for any acts allegedly committed in the Kingdom of the Netherlands or the People's Republic of China because those acts fall outside New York's power to prescribe.  *See People v. McLaughlin*, 80 N.Y.2d 466, 471 (1992) ("Because the State only has power to enact and enforce criminal laws within its territorial borders, there can be no criminal offense unless it has territorial jurisdiction."); RESTATEMENT (THIRD) OF FOREIGN RELATIONS § 432 (1) ("A state may enforce its criminal law within its own territory through the use of police, investigative agencies, public prosecutors, courts, and custodial facilities, provided (a) the law being enforced is within the state's jurisdiction to prescribe . . .").  As a fundamental principle of New York law, New York does not criminalize acts that occur abroad.  McKinney's Statutes § 149 ("The laws of one state can have no force and effect in the territorial limits of another jurisdiction, in the absence of the consent of the latter."); *Western Transp. & Coal Co. of Mich. v. Kilderhouse*, 87 N.Y. 430, 435 (1882) ("It is very well settled that penal laws have no extra-territorial force."); *see also* RESTATEMENT (FIRST) OF CONFLICT OF LAWS § 425 ("Except as stated in § 426 [acts by U.S. national, on U.S. vessel, or in territorial waters], a state has no jurisdiction to make an act or event a crime if the act is done or the event happens outside its territory.").

---

[8] On their face, these allegations of conduct 3 years apart cannot form the predicates for the "course of conduct" charges pursuant to Sections 120.14(2), 120.50(3), 120.45(2), and 240.26(3).  *See People v. Webers*, 808 N.Y.S.2d 920 (1st Dep't 2005) (as a matter of law, 2 telephone calls over 4 months apart do not constitute "a course of conduct" under second-degree harassment statute); *People v. Bilus*, 804 N.Y.S.2d 670, 675 (Dist. Ct. Nassau Cnty. 2005) (2 visits to complainant's work address 6 months apart "do not constitute a course of conduct" for purpose of fourth-degree stalking).

[9] The only other **Conduct Allegation**—that Mees showed up in Buiter's apartment building—is triple-hearsay. Mees was visiting the Consul General of her country, who happens to live in the same building (*see* **Ex. 7**)—a visit protected by Article 36 of the Vienna Convention on Consular Relations, 21 U.S.T. 77 (1963) (providing that "consular officers shall be free to communicate with [their] nationals" who "shall have the same freedom with respect to . . . access to consular officers").  Buiter (or Ms. Schott) appears to have misunderstood the he-said-she-said-he-said-she-said relay of communications.  Buiter concedes in an affidavit submitted in related civil litigation that "on the night of May 6, 2013, . . . the *doorman* in the building in Manhattan where my wife and I live *informed us* that Mees . . . *was asking to see us*.") (emphasis added).  **Ex. 8** (excerpts from Buiter Affidavit) ¶ 27.  Buiter's wife confirms that *she* was the one who spoke with the doorman.  **Ex. 9** ("[T]he doorman at our apartment building *informed me* that Mees was in the lobby to see my husband and me.") (emphasis added).  Because hearsay, and certainly triple hearsay, is unreliable and prone to give rise to misunderstandings such as these, New York requires that a misdemeanor Information be based on "[n]on-hearsay allegations."  CPL § 100.40(1)(c); *accord People v. South*, 912 N.Y.S.2d 837, 840-41 (App. Term 2010) (finding facial insufficiency because "an information must allege nonhearsay facts").  This allegation thus has no place in the Information.

Cyrus R. Vance, Esq.
October 28, 2014
Page 11 of 17

While the legislature may create certain exceptions, it is "the settled rule of statutory interpretation, that unless *expressly* stated otherwise, 'no legislation is presumed to be intended to operate outside the territorial jurisdiction of the state . . . enacting it.'" *Goshen v. Mut. Life Ins. Co. of N.Y.*, 730 N.Y.S.2d 46, 47 (1st Dep't 2001) (citation omitted; emphasis added); *cf. Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 248 (2010) ("When a statute gives no clear indication of an extraterritorial application, it has none."). There is nothing, let alone express language, in the harassment, menacing, and stalking statutes at issue here to suggest that the legislature intended to prescribe acts outside the territory of New York State or the United States.

Even if Sections 120 and 240 of the Penal Code did have an extraterritorial scope, as a matter of conflict of laws New York law has no application. Under well-established conflict rules, the law of the state where an act is done or event is caused determines whether the act or event is a crime. RESTATEMENT (FIRST) OF CONFLICT OF LAWS § 428(1). "A person is liable to punishment for a crime, therefore, only by the law of the state where the essential event takes place and only if the law of that state makes the event punishable." *Id.* § 428 cmt. a. Here, the hotel visits allegedly occurred in the Netherlands and China, and so the respective criminal laws of these countries, *not* New York law, determine whether the acts constitute crimes.

We have solicited the opinions of experts from the Netherlands and China, and both have confirmed that the alleged hotel visits are not criminal offenses in their respective countries. *See* **Ex. 10** (Declaration of Hon. Willem Geelhoed) ¶ 3 ("The accusations against Dr. Mees—*i.e.* that she tried to meet with Prof. Buiter, tried to be let up to Prof. Buiter's hotel room, and/or used a false name—do not, either jointly or in isolation, constitute a criminal offense under the criminal laws of the Netherlands, and do not violate any laws of the Netherlands."); **Ex. 11** (Declaration of Chen Yun, Esq.) at 2 ("There is no provision in the Criminal Law of the People's Republic of China or any criminal regulations of the City of Beijing that prohibits 'stalking' or 'harassment.' Nor is there any other criminal prohibition that even comes close to criminalization of the conduct . . . at issue here."). Accordingly, the extraterritorial **Conduct Allegations** are an improper basis for this prosecution.

### B.   This Prosecution Violates Federal and International Law.

The continued prosecution of our client for acts she allegedly committed abroad also violates federal due process and international law. For extraterritorial application of a criminal statute to comport with due process "there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *United States v. Youssef*, 327 F.3d 56, 111 (2d Cir. 2003) (citation omitted); *accord United States v. Caicedo*, 47 F.3d 370, 372 (9th Cir. 1995). ("[P]unishing a crime committed on foreign soil . . . is an intrusion into the sovereign territory of another nation. As a matter of comity and fairness, such an intrusion should not be undertaken absent proof that there is a connection between the criminal conduct and the United States sufficient to justify the United States' pursuit of its interests."). Whether a sufficient nexus exists, is governed by well-established principles of international law, including the principles of international comity reflected in Sections 402 and 403 of the Restatement of Foreign Relations.

Cyrus R. Vance, Esq.
October 28, 2014
Page 12 of 17

As you know, "[i]nternational law is a part of our law and as such is the law of all States of the Union." *Skiriotes v. State of Fla.*, 313 U.S. 69, 72-73 (1941); *accord Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 374 F. Supp. 2d 331, 339 (S.D.N.Y. 2005) (international law "binding on all States"); RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 111 (1987) ("International law [is] supreme over the law of the several States."). "Since international and other foreign relations law are the law of the United States, under the Supremacy Clause of the Constitution an exercise of jurisdiction by a State that contravenes the limitations of §§ 402-403 is invalid." REST. (THIRD) OF FOREIGN REL. § 402 cmt. k.

Under international law, as codified in Section 402, there are only five bases for giving criminal statutes an extraterritorial scope—the universality principle, the nationality principle, the objective territorial principle, the protective principle, and the passive personality principle. *Youssef*, 327 F.3d at 91 n. 24; REST. (THIRD) OF FOREIGN REL. § 402 (1987).  None of these grounds provides a basis for prosecution here.

The *universality principle* is limited to crimes so heinous as to be universally condemned by all civilized nations.  It confers no jurisdiction over a lovers' quarrel.  The *nationality principle* applies only to acts committed abroad by U.S. citizens.  *Matter of Garcia*, 802 F. Supp. 773, 780 (E.D.N.Y. 1992) (nationality principle has no application if defendant "is not a citizen, but only a resident alien").  It has no application here because Mees is not a U.S. citizen.

The *objective territorial principle* also can have no application here.  It governs "[a]cts done outside a jurisdiction but intended to produce and producing detrimental effects within it." *Strassheim v. Daily*, 221 U.S. 280, 285 (1911) (Holmes, J.).  Thus, for New York to have geographical jurisdiction when conduct occurs outside of the state's borders requires a result or effect within the state.  *See* CPL § 20.20(2)(a)-(b).  It is obvious, however, that Mees' alleged 2010 visit to Buiter's hotel in China had no effect in the State of New York or any U.S. territory.  Buiter lived and worked in the United Kingdom at the time.  He had lived there for 19 years, and did not move to New York until nearly three years later.  Nor could Mees have *intended* a visit to her lover to have a substantial effect in the United States three years before he would move there.  The same is true for the purported visit to his Amsterdam hotel in January 2013, at least a month and a half before Buiter even became a resident of this State.  Neither the result nor any intended effect occurred in New York.

Similarly, the *protective principle*[10] permits the criminalization or prosecution where out-of-state acts harm *the State's* interests.  *See Taub v. Altman*, 3 N.Y.3d 30, 34 (2004) (there must be a "concrete and identifiable injury" to either the county's governmental processes or the welfare of the community); CPL § 20.10(4) (defining "particular effect" as "a materially harmful impact upon the governmental processes or community welfare" in the jurisdiction).  Thus, in order for prosecutorial jurisdiction to lie, New York County must have suffered a materially harmful impact, "more than minor or incidental," on "'the well being of the community as a whole,' not merely a particular individual."  *Zimmerman*, 9 N.Y.3d at 425 (citation omitted);

---

[10] Or "particular effect theory of geographical jurisdiction" (*People v. Zimmerman*, 9 N.Y.3d 421, 426 (2007); *see* CPL § 20.20(2)(b) (requiring an intent to cause "a particular effect in this state")), also known in New York as the "injured forum principle" (*Steingut v. Gold*, 42 N.Y.2d 311, 321 (1977)).

Cyrus R. Vance, Esq.
October 28, 2014
Page 13 of 17

*accord People v. Fea*, 47 N.Y.2d 70, 76-77 (1979).  In other words, the extraterritorial conduct must have "exposed a large number of county residents to a specific harm."  *Taub*, 3 N.Y.3d at 36.

No such interests are even remotely implicated here.  Buiter and his wife were not residents of any county in the State, either in 2010 or in January 2013.  Buiter's children, who are British citizens, have never lived in the State of New York and are not part of this community.  It would strain credulity to argue that the alleged hotel visits in the Netherlands and China—which obviously did not involve either Buiter's wife or his children—even come close to having *any* impact, let alone a "materially harmful impact," on the Manhattan "community as a whole."  *Zimmerman*, 9 N.Y.3d at 425.  If there were any discernible effect, it would be minor and incidental, affecting no more than one or two particular individuals, who only later decided to become residents of New York.

The *passive personality* principle, which would permit a state to apply its criminal laws to an act committed by a non-citizen on foreign soil, "has not been generally accepted for ordinary torts or crimes," and is only gaining acceptance "as applied to terrorist and other organized attack on a state's nationals by reason of their nationality, or to assassination of a state diplomatic representatives or other officials."  REST. (THIRD) OF FOREIGN REL. § 402 cmt. g; *see id*. § 402(3) ("certain conduct outside its territory by persons not its nationals that is directed against the security of the state or against a limited class of other state interests").  We have found no cases suggesting that the passive personality principle has ever been accepted, or even invoked, in the state of New York.  No New York court has so much as *mentioned* this principle, and no U.S. court, state or federal, has ever permitted the prosecution of a misdemeanor offense for any act allegedly committed on foreign soil based on the passive personality principle.  *See* RESTATEMENT (SECOND) OF FOREIGN RELATIONS (1965) § 30(2) ("A state does not have jurisdiction to prescribe a rule of law attaching legal consequences to conduct of an alien outside its territory merely on the ground that the conduct affects one of its nationals."); *id*. cmt. e (Subsection (2) of this Section rejects the so-called "passive personality" principle under which a number of states assert that they may prescribe rules governing the criminal conduct of aliens outside their territory if the victims of the crime are their nationals.").

ADA Schott is criminally prosecuting a Dutch national for acts committed in her own country and China, where those acts are not a crime. This is particularly troubling because Buiter was at the time of these alleged incidents not even a resident of New York (or the United States). Accordingly, there is no internationally recognized justification for this kind of far-reaching exercise of extraterritorial jurisdiction. We further note that, as the Hon. Willem Geelhoed attests, if the situation were the reverse, the Netherlands would, as a matter of law and a policy to avoid diplomatic or political irritation from other countries, *refrain* from exercising extraterritorial jurisdiction under these circumstances (**Ex. 10** ¶¶ 4-13, esp. ¶¶ 11-12). As a matter of comity and reciprocity, your Office should do the same.  We discussed this issue with ADA Schott, but she expressed an unwillingness to change her position.  Now that we have provided you with controlling legal authorities, we ask that you reconsider and stop prosecuting our client for any and all extraterritorial acts.

Cyrus R. Vance, Esq.
October 28, 2014
Page 14 of 17

**V.    It Appears that Your Office Was Misled Into Prosecuting this Case by a Series of False Statements and Fabricated Evidence.**

A further reason to drop all charges against our client unconditionally are the very significant, indeed alarming, falsehoods that accompany Buiter's sworn statements to the police and your Office.  This leaves your key witness without credibility at trial and casts serious doubt on our client's guilt.

The most troubling misleading information Buiter has provided concerns naked pictures of Mees masturbating, which Buiter told your Office that Mees sent him and which he claimed he experienced as annoying (**Ex. 2** at 2).  But apart from the fact that Buiter *requested* nude pictures from Mees (**Ex. 6**) (but was not given any), alarming new evidence we recently obtained from Buiter himself shows the opposite of what he represented to your Office:  that Buiter *voluntarily* engaged in Skype sex with Mees of which he even took no less than 1,252 screenshots, which he then saved on his computer.[11]  Mees never gave Buiter permission to record her and, in fact, told him not to.  Both the fact that Buiter has been making extensive records of their Skype sex sessions and the fact that he was even on Skype clearly demonstrate that he lied when he claimed that Mees' nudity annoyed him.  No one can be forced to go onto Skype and "undergo" the viewing of sexual activity.[12]

We stress that Mees takes this very intrusive invasion of her privacy very seriously and does not appreciate that their intimate love play has now apparently been shared with policemen, several people in your Office, and Buiter's three law firms.  Buiter's actions may implicate Pen. L. § 250.45, which prohibits the surreptitious recording of a person's intimate parts without that person's permission.  *See People v. Schreier*, 22 N.Y.3d 494 (2014).

Similarly troublesome is Buiter's evidence in support of his representation that "Mees caused him annoyance and alarm by sending him "over three thousand emails" (**Ex. 3** at 2).  This accusation appears to have been crucial to the ADA's decision to prosecute.  Recently produced evidence shows, however, that this, too, was a lie.  Buiter initially claimed that the 3,000 emails were sent "[b]etween November 9, 2009, and July 1, 2013" (*id.*).  After Mees shared with your Office several emails showing that the relationship had *not* ended in November 2009 (*see* **Exs. 14, 16-17, 19**), Buiter changed his story.  He now claims that 3,487 emails were sent "between July 12, 2012 and July 1, 2013" (**Ex. 8** (Buiter Aff.) ¶ 4).  The emails Buiter handed to your Office (which he produced to Mees only two weeks ago, as part of civil defamation case in the New York Supreme Court) show that 781 of them had gone straight into his spam folder, and thus could not have caused him any annoyance whatsoever.

---

[11] Buiter's actions may implicate Pen. L. § 250.45, which prohibits the surreptitious recording of a person's intimate parts without that person's permission.  *See People v. Schreier*, 22 N.Y.3d 494 (2014).

[12] Buiter claims that Mees took the screenshots herself and emailed them to him, ***and that they then accidentally and "automatically" got saved on his computer***.  This is absurd.  If it were true, Buiter should produce those emails or the screenshots in their native format, which will reveal on whose computer they were taken.

Cyrus R. Vance, Esq.
October 28, 2014
Page 15 of 17

Particularly alarming is that *no less than 536 emails are identical to other emails included in Buiter's batch*.  In other words, in an apparent effort to ensure that even the post-July 2012 emails (as opposed to the post-November 2009 emails) added up to the 3,000 number, **Buiter simply copied 536 emails multiple times**.  (55 emails were printed as many as 10 times or more, and 21 emails more than 25 times; identical copies of the alleged "death wishes" were copied more than 11 times).  Contrary to Buiter's representations, the total number of non-duplicative emails is not 3,487 but 1,397.  Eliminating both the duplicates *and* emails from the spam folder that Buiter did not even see, the maximum number of emails Buiter could claim as "annoying," sent over the course of an entire year, is 616.  Buiter's accusation inflated that number by a whopping 400%.

Disconcerting is further that while Buiter told your Office that Mees sent him 164 Facebook messages (**Ex. 3** at 2), all evidence of those messages in their native format—necessary to determine their receipt extraterritorially—may recently have been destroyed, when on August 15, 2014, during the pendency of this case, *Buiter decided to close his Facebook account* (**Ex. 26** at 2).  We asked Ms. Schott if she has a copy of those Facebook messages but she has not responded.  Both Facebook and Buiter have refused to unequivocally confirm that Buiter's action did not result in the destruction of highly relevant evidence.

Further evidence of significant falsehoods that misled your Office including the following:

• *Buiter represented that he has been telling Mees since November 7, 2009 to stop contacting him* (**Ex. 3** at 2), as if he has been a victim of harassment and stalking ever since.  It appears that the sheer length of Mees' purported intrusions into Buiter's life (several *years*) was an important factor in the decision to prosecute the case.  But the statement was completely misleading because the sexual affair then continued, at Buiter's initiative, for at least another two-and-a-half years. Within a few months after his November 2009 message—but in any event no later than April 2010—Buiter had already changed his mind.  On April 14, 2010, Buiter emailed Mees his hotel address in Amsterdam as soon as he arrived and asked for her plans for later that evening (**Ex. 12**).  This flip-flopping characterized Buiter's attitude toward Mees throughout their relationship: presumably out of guilt or to maintain plausible deniability vis-à-vis his wife, he *tried* to say no; but he was never able to control himself for long.  For example:

-- On July 29, 2011, Buiter used harsh words when he told Mees she was "a stalker and harasser" and that "no more contact ever is the only solution" (**Ex. 13**).  But *a few hours later* he agreed that Mees should show her "positive attributes" by showing her "hot pink suede dress" (*id*.).

-- On August 9, 2011, Buiter again accused Mees of "stalking and harassment" (**Ex. 14**) but nevertheless told her they would not have Skype sex *for only "the next 3 or 4 days"* while his nephew and three friends were staying at his house (*id*.).

-- On August 13, 2011, Buiter told Mees:  "Just go away and stay away" (**Ex. 15**).  But only a week later, on August 20, 2011, Buiter asked Mees if he could add her to his

Cyrus R. Vance, Esq.
October 28, 2014
Page 16 of 17

BlackBerry Messenger Contact list (**Ex. 16**), and a few hours after that he was driving over to Mees' apartment, as evidenced by his email asking for directions (**Ex. 17**).

-- On June 22, 2012, Buiter told Mees "F… off and leave me alone forever" (**Ex. 18**). But only four days later, on June 26, 2012, Buiter reached out to Mees repeatedly on Skype late at night (**Ex. 19**). Eight days later, on July 4, 2012, Buiter began sexually provoking Mees by referring to himself in the midst of a business conversation as an "Enema-loving Brit" (**Ex. 20**).[13]

As this history of Buiter's communications indicates, even "serious" accusations of stalking meant nothing to Buiter, were pure window-dressing for his wife, and certainly did not mean that Mees "was previously *clearly* informed to cease" her conduct, as fourth-degree stalking requires. Pen. L. § 120.45(2) (emphasis added). Thus, when Buiter and his wife had their lawyer send Mees a cease-and-desist letter in February 2013, but Buiter repeatedly continued to try to contact Mees on Skype (**Ex. 21**), it was justifiable not to take that message seriously.

- *Buiter represented that Mees caused him annoyance and alarm by sending him sexually explicit messages* (**Ex. 3** at 2). We believe that the ADA found this allegation troubling and an important reason to prosecute this case. But Buiter was not annoyed or alarmed by the use of sexually explicit language or by the receipt of such messages from Mees at all. In fact, at one point, after Mees sent him a sexually explicit message, Mees asked if he found her dirty now, to which Buiter replied "Why on earth would I?" (**Ex. 23**). The sampling of emails attached as **Exs. 5** and **20** also leave no doubt that Buiter responded to Mees' messages with similar (or worse) sexually explicit language. They also show that Buiter himself *initiated* unsolicited sex talk (either initiating the conversation or responding to a business conversation with lewdness). The recently produced emails that Buiter gave your Office when he reported Mees shows that *none* of the vulgarity *he* sent to Mees was made part of the selection he chose to share with your Office. Buiter thus actively painted a one-sided picture of the relationship and misled your Office into thinking that sex talk is something that annoys him.

- *Buiter represented that Mees tried to meet him in his hotel in Beijing, China* (**Ex. 3** at 2). An email we discovered after the ACD was entered shows, however, that this encounter was pre-arranged between Buiter and Mees. *See* **Ex. 24** (for context, similar messages from Buiter advising Mees of his schedule so that they could meet up for sex are also attached).

- *Buiter represented that Mees harassed his children by sending them emails* (**Ex. 2** at 2). It appears that, as one would expect, the special protection that the law accords to children was a very important factor for ADA Schott. But, as Ms. Schott will be able to confirm, there is actually not a single email from Mees to Buiter's "children" in the 3,000 pages of emails that Buiter gave her.

---

[13] Buiter's inability to control his urges even continued after he had formally complained to the police about harassment and stalking in May 2013. On June 19, 20, 23, and 28, 2013, Buiter reconnected with Mees on Skype and tried to call her several times, including four days before her arrest (**Ex. 21**). After Mees was released from Riker's Island Correctional Facility, Buiter contacted her again (**Ex. 22**).

Cyrus R. Vance, Esq.
October 28, 2014
Page 17 of 17

- *Buiter further told your Office that he feared for the safety of his family* (**Ex. 3** at 2). But this is nonsense.  Not only did Mees never send the children any emails, Buiter's "children" are grown-ups in their twenties, who appear to live in California and Pennsylvania, far away from both Buiter and Mees.  Each time he and his wife moved to a new apartment, Buiter made sure to advise Mees of the new address and contact information (*see* **Ex. 25**)—not something a real victim would do if he genuinely believed he was being stalked.

_____

Accordingly, we respectfully suggest that the continued prosecution of our client has become unacceptable for multiple reasons that ought to lead your Office to do the right thing:  to drop the charges and move the court to modify the ACD and dismiss this case unconditionally.  We request an in-person meeting to discuss this matter further, and are available to answer any questions you may have.

Sincerely,


Ira D. London                                    Olav A. Haazen

London & Robin                            Boies, Schiller & Flexner LLP
99 Park Avenue, Suite 1600          333 Main Street
New York, New York 10016          Armonk, New York 10504

*Counsel for Heleen Mees*              *Counsel for Heleen Mees*