# EXHIBIT M

| People v Mees, Heleen |
| --- |
| Motion No: 570109/19 |
| Slip Opinion No: 2019 NY Slip Op 64973(U) |
| Decided on March 7, 2019 |
| Appellate Term, First Department, Motion Decision |
| Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431. |
| This motion is uncorrected and is not subject to publication in the Official Reports. |

March 7, 2019

People v Mees, Heleen

It is ordered that the defendant-appellant's motion seeking for leave to appeal from the January 25, 2019 order is denied.

By: Shulman, P.J., Cooper, Edmead, J.J.

Motion No. 570109/19

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE TERM, FIRST DEPARTMENT
_____

THE PEOPLE OF THE STATE OF NEW YORK

Index No. 2013NY050589

**NOTICE OF MOTION**

AGAINST

HELEEN MEES,

Defendant.

_____

      **PLEASE TAKE NOTICE**, that upon the annexed affidavit of Heleen Mees, sworn to the

11th day of February 2019, and all prior papers and proceedings in this action, the Defendant will

move this Court on the 25th day of February 2019, at **60 Centre Street, N.Y., N.Y., Room 401 at**

**10:100 a.m.** or as soon thereafter as counsel can be heard for an order for leave to appeal from the

order of January 25, 2019, denying my amended petition for writ of *coram nobis* relief.

Dated: New York, NY
      February 11, 2019

Signature

HELEEN MEES
THE SWEENEY BUILDING
30 Main Street, Apt. 11H
Brooklyn, New York 11201
heleen@heleenmees.com
(917) 325-5877

*Defendant Pro Se*

To:    Manhattan District Attorney's Office

1

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE TERM, FIRST DEPARTMENT
_____

THE PEOPLE OF THE STATE OF NEW YORK

                                          2013NY050589

                        AGAINST                **AFFIDAVIT IN SUPPORT OF MOTION FOR LEAVE TO APPEAL**

HELEEN MEES,
                            Defendant.
_____

State of New York, County of New York ss:

Heleen Mees, being duly sworn, deposes and says:

## I.    INTRODUCTION

1.    On January 25, 2019, Judge Statsinger of the Manhattan Criminal Court denied my amended petition for writ of *coram nobis* relief to vacate the Adjournment in Contemplation of Dismissal pursuant to CPL § 170.55(1) entered in this case on March 10, 2014, for the reason that an ACD is not a conviction under New York law even though the ACD is considered a conviction and an admission of guilt under federal statutes. Attached hereto as Exhibit A is a true and correct copy of the order of January 25, 2019.

2.    I am entitled to writ of *coram nobis* relief because my counsel declined to move this Court to undo the ACD before it expired despite my request that he do so. Attached hereto as Exhibit B is true and correct copy of the affidavit of Ira D.

London. Per the Court of Appeals, when defense counsel disregards client's timely request to file a notice of appeal, defense counsel "acts in a manner that is professionally unreasonable." *See People v. Syville*, 15 N.Y.3d 391, 397 (N.Y. 2010). The same must apply to my defense counsel's declination to the Manhattan Criminal Court to vacate the ACD before it expired on March 10, 2015. *See* Exhibit B, ¶3.

3.    I am also entitled to writ of *coram nobis* relief because my counsel did not inform me of any adverse collateral consequences of an ACD respecting future work permits and border control. *See* Exhibit B, ¶4. This is a serious omission by counsel. *See Smith v. Bank of Am. Corp.*, 865 F. Supp. 2d 298 (E.D.N.Y. 2012) (holding that plaintiff's state defense counsel's omission to inform plaintiff of the adverse collateral consequences of an ACD respecting future employment constitutes a serious omission). In *Padilla v. Kentucky*, 559 U.S. 356 (2010), the U.S. Supreme Court held that a constitutionally competent counsel would have advised the defendant about the collateral consequences of a plea.

4.    The right to effective assistance of counsel settled under both the Federal and State Constitutions. *See People v. Bachert*, 69 N.Y.2d 593 (N.Y. 1987). The Court of Appeals recognized the writ of *coram nobis* as the <u>best available remedy under all the circumstances</u>. The Court of Appeals held that inasmuch as the Criminal Procedure Law failed to anticipate and to provide for a particular situation, the remedy lies in the invocation and determination of the traditional writ of *coram*

*nobis. Id.*. The Court of Appeals has not hesitated to expand the scope of *coram nobis* when necessary to afford the defendant a remedy in those cases in which no other avenue of judicial relief appeared available. *See People v. Hairston,* 10 N.Y.2d 92, 93-94.

5.     This Court should also consider that the People deliberately thwarted me by running out the clock on me and telling my counsel that the ACD could still be undone after it had expired. *See People v. Johnson*, 69 NY2d 339, 341-342 (N.Y. 1987) (holding that defendant's timely efforts to appeal were thwarted by the State wherefore the People cannot rely upon a subsequently imposed time limitation to prevent a defendant from obtaining appellate review of his conviction).

6.     I want the ACD to be vacated because the Manhattan District Attorney obtained the ACD in violation of my rights under the Constitution of the State of New York and the Constitution of the United States by suppressing material exculpatory evidence that goes to my guilt or innocence or punishment. *See People v. Martin*, 240 AD2d 5 (1st Dept., 1998). The exculpatory evidence consists of 1,251 unlawful surveillance images that were used to incite my arrest. While a *Brady*-violation does not require the willful suppression of material exculpatory evidence, the facts in the instant case make clear that the Manhattan District Attorney's office did willfully suppress the 1,251 unlawful surveillance images, which makes the matter even more egregious. *See People v. Vilardi*, 555 N.E.2d 915, 918 (N.Y. 1990).

## II.    RELEVANT FACTS

7.    On July 1, 2013, I was arrested on various charges that stem from a complaint by fellow economics professor and chief economist of Citigroup, Willem H. Buiter ("Buiter"). At the time, I was a New York University economics professor, political commentator, author, and public figure in my country of origin. Buiter incited the police to arrest me and the Manhattan District Attorney's office to prosecute me, by making a series of false statements to the police, including that I harassed him by "sending him naked pictures of [myself] masturbating" that purportedly caused him severe annoyance and alarm.  Attached hereto as Exhibit C is a true and correct copy of the criminal complaint of July 1, 2013.

8.    Because of Buiter's false allegations, I spent four days in jail at Rikers Island and the matter was highly publicized all over the world. Following my arrest, I lost my job as a professor at New York University, all my columns in international magazines and newspapers, as well as my speaking engagements and consulting jobs. Due to the publicity surrounding this matter, I have been unable to obtain gainful employment and am left with virtually no sources of income more than five years after my arrest. Because of all that has transpired since my arrest and prosecution, I suffer from posttraumatic stress disorder and dysthymia (chronic depression).

9.    In view of the substantial falsehoods in the superseding accusatory instrument of August 5, 2013, the Manhattan District Attorney's office offered in

March 2014 to discontinue my criminal prosecution by way of an Adjournment in Contemplation of Dismissal. Unaware of the trove of unlawful surveillance images in the criminal file, I consented to the ACD, which was entered by the Honorable Steven Statsinger on March 10, 2014.

10.     Even though the Manhattan District Attorney's office acknowledged that there was no ground for my prosecution, Buiter continued his libelous campaign against me, repeating his false accusations of stalking and harassment in an elaborate public posting on Facebook of March 10, 2014. On June 26, 2014, I filed a complaint against Buiter in the New York Supreme Court, Kings County, on various grounds, including defamation, false arrest, and intentional infliction of emotional distress.

11.     Buiter responded in October 2014 with a motion to dismiss to which he attached 1,251 nude photos of me, claiming that I had sent him those photos. I saw the nude photos for the very first time on October 10, 2014, when my counsel forwarded me "Exhibit L", which was an email with 4 PDF-files attached thereto containing 1,251 nude photos. Contrary to what Buiter had represented to the police and prosecution, the 1,251 nude photos were surreptitiously and illegally taken by Buiter himself during his intimate Skype interactions via Skype webcam with me.

12.     On October 13, 2015, the U.S. District Court for the Southern District of New York ordered Buiter to produce the 1,251 in JPEG-files, which were at the time presented to us as the original photo files. My Dutch counsel then

commissioned forensic experts SBV Forensics to examine all 1,251 photographs and all forensically imaged computers that I have had in my possession since 2008.

13.     Based on a forensic analysis, SBV Forensics concludes that it is a near certainty that I did not take the photographs, either with a phone, a standalone camera or a webcam, and that it is beyond a reasonable doubt that I did not send the photographs from any of her devices. Attached hereto as Exhibit D is a true and correct copy of the report by SBV Forensics.

14.     Specifically, SBV Forensics concludes with respect to the photo files:

a. Because the photos were produced in both PDF (1,388) and JPEG format (1,251), it can be determined through a comparison of MD5 hash values and "data carving" that Defendant in fact had more unique naked photos of Mees in his possession than he represented (1,288 instead of 1,251).  Among both the PDFs and the JPEGs there were also many duplicates (pp. 3-6).

b. Based on Mees's position in the photos, it is impossible that she manually took the photos herself.  Because variations between successive pictures are mostly minor, which indicates only minimal intervals between them, it is also highly unlikely that the photos were taken in auto mode with a timer (pp. 6, 19-20).

7

c. The format of the photos (640 pixels by 480 pixels, for a total of some 300,000 pixels) is inconsistent with the use of a digital camera.  Images taken with digital cameras are measured in millions of pixel ("megapixels") (pp. 7, 19).

d. The pictures' VGA resolution is, however, consistent with the use of either a webcam or a handheld phone camera (pp. 7-8, 19).

e. The low number of EXIF metadata captured on the JPEG files is inconsistent, however, with the photos having been taken with a handheld phone.  It is also inconsistent with the use of a digital camera.  Both would have registered additional metadata, such as various characteristics of the camera lens or the brand and type of the phone used (pp. 8, 19).

f. The EXIF metadata that was found, e.g. data indicating that no flash was used, excludes the possibility that the photos were stills derived from video footage (which does not register any information on the use of a flash) (pp. 8, 19).

g. The depth and camera angles of the photos are also consistent with the use of a webcam (pp. 7, 19).

h. The picture files are consistent with still images taken during a live video chat on a platform like Skype.  If the screenshots were taken on an Apple computer, however, such as used by Mees, Apple's operating system (Mac OS X) would have saved them as PNG files—not, as is the case here, as JPEGs (pp. 8-9, 19).

i. Photo Booth, which is a standard Apple application does save photos in JPEG format but the photos' metadata is inconsistent with the use of Photo Booth because such use would have automatically registered the application's name as an IPTC field in each file (p. 9).

j. The photos have a resolution of 96 dpi, which is also not consistent with the use of Apple computers or digital cameras, which automatically generate images with resolution of 72 dpi.  The photos' 96 dpi resolution is, however, consistent with the use of a Windows computer (which Mees believes Buiter uses exclusively) (p. 10).

k. There is no indication on any of Mees's Apple computers that any metadata or file characteristics were manually manipulated.  Manual editing would require opening, editing and re-saving each of the 1,288 unique picture files individually and would therefore be extremely time-consuming. No Windows programs and no virtualization software were found on any of Mees's laptops (pp. 10, 19).

With respect to Defendant's possession of the photos but not the emails by which they were supposedly transmitted, SVB Forensics concludes:

l. It is virtually certain that the photos were never on Mees's laptops.  If they were, it would have been possible to retrieve or restore the files forensically. It is nearly impossible and technically very complex to individually remove

files in a manner that guarantees the user that the files are forever irretrievable (pp. 11-15, 19-20).

m. Secure removal of email files in a way that makes retrieval impossible also requires highly specialized knowledge of the workings of the Mac OS X operating system. No emails of the kind Buiter claims existed were found, however, on Mees's computers (pp. 13-15, 20).

n. The "rule" that Buiter claims explains why the photos were saved, while the emails purportedly attaching them were deleted, would in principle have saved identical pictures only once, overwriting prior versions of the same attachment or make. The presence of duplicate photos in Buiter's files is inconsistent with such working of the rule (pp. 17, 18).

o. The rule is also inconsistent with the fact that a different picture ("moi.jpg"), which the parties agree Mees did send Buiter (more than once) and for which Buiter can produce the emails to which it was attached, was not saved in the same attachment folder, and that yet a third picture Mees sent ("plaatje.jpg") was also not saved there (p. 18).

p. Taking into consideration that the file names contain only a sequential number as well as the fact that numbering did not restart at the first picture from a new session, it is a near certainty that Buiter changed the file names before handing them to the police and the Manhattan District Attorney's office.

15.     Accordingly, Buiter's excuse for his possession of photos of my private parts is not supported by forensics. This leaves no other reasonable explanation than that Buiter took the photos. The forensic investigation also corroborates my account that our intimate interactions via Skype were never meant to be recorded, that I was unaware of the recordings, and that I never consented to being recorded.

16.     The 1,251 photos show me nude or partially dressed. There are hundreds of photos in the criminal file in which I am wearing a floral print dress that I bought on April 6, 2011.[1] All the photos in which I am wearing said floral print dress were taken on or after April 6, 2011. Buiter not only actively participated in Skype webcam calls in which we would both undress on or after April 6, 2011, he also made extensive records of it for his own personal pleasure, yielding no less than 1,251 unlawful surveillance images.

17.     Since no one can be forced to undergo the viewing of sexual activity through Skype webcam, let alone make extensive records of it, the romantic relationship between Buiter and me lasted at least until April 6, 2011. The accusatory instrument of August 5, 2013, alleges that the acts of stalking, harassment, and menacing occurred from November 7, 2009 until July 1, 2013. The 1,251 nude photos show that I am innocent of harassing, stalking, and menacing Buiter at the

---

[1]   This motion for leave to appeal does not attach all evidential material that is available.

very least until April 6, 2011. The extent of the stalking, harassment, and menacing, if it occurred at all, is an important factor to be weighed for punishment. The 1,251 unlawful surveillance images are thus material to my guilt or innocence or to my punishment.

18.    The accusatory instrument of August 5, 2013, accuses me of sending Buiter 55 'sexually explicit' emails. This must be a reference to the nude photos that Buiter claims I sent him because I never sent Buiter 55 sexually explicit emails. The report by SBV Forensics show that I did not make nor sent Buiter the 1,251 nude photos show and thus that I am innocent of the alleged sending of 55 'sexually explicit' emails. The 1,251 unlawful surveillance images are thus material to my guilt or innocence or punishment.

19.    If Buiter had indeed felt annoyed, alarmed or fearful of me, my nudity, or any of my communications, it stands to reason that Buiter would have destroyed the 1,251 nude photos of me, which he should never have taken in the first place. But not only did Buiter not destroy the 1,251 nude photos, he did the opposite. Buiter saved the 1,251 nude photos on his handheld devices and stored them in his Verizon cloud service so that he could access them anywhere in the world. Buiter's actions do not comport with genuine feelings of annoyance, alarm, and fear, which are a *sine qua non* for the charges of stalking, harassment, and menacing. The 1,251 unlawful surveillance images are thus material to my guilt or innocence or to my punishment.

20.     This Court has ruled that a guilty plea can be overturned because of pre-plea *Brady*-violations. In addition to the threshold *Brady*-analysis, i.e., whether the evidence is material to the issue of guilt or punishment, the Court adopted a standard that also requires an analysis of whether the information, if disclosed, would have materially affected the defendant's decision to plead guilty.

21.     I would never have accepted the ACD as an outcome had I known of the trove of unlawful surveillance images in the criminal file. With other words, I would not have accepted the ACD if I had known that I was the victim of a felony sex crime of unlawful surveillance (1,251 counts) and the perpetrator used the spoils of his crime to have me arrested. When I found out on October 10, 2014, that 1,251 unlawful surveillance images were used for my arrest, my counsel sent a letter to District Attorney Cyrus Vance on October 27, 2014, to demand an investigation and drop all the charges that were still pending in the context of the ACD. The Manhattan District Attorney's office agreed to a meeting on November 26, 2014.

22.     After meeting with my counsel on November 26, 2014, the Manhattan District Attorney's office waited almost three months, i.e., until February 10, 2015, to inform me that the District Attorney's office was not prepared to dismiss the charges in the interest of justice. During those three months, the District Attorney's office did literally <u>nothing</u> to investigate the photos nor did it interrogate the complaining witness, Buiter. Moreover, the Manhattan District Attorney's office

13

assured my counsel that I could come back if I had more evidence and that the case could still be reopened once it was sealed. The Manhattan District Attorney's office also refused to give me the 1,251 photo files that were part of the criminal file even after I informed him that the photos constituted material exculpatory evidence that goes to my guilt or innocence and punishment. The Manhattan District Attorney's office made me file a FOIL request by which it only complied on December 2, 2015, while the ACD expired on March 10, 2015. The FOIL production included about 1200 unlawful surveillance images of me.

23.    When the Manhattan District Attorney's office informed me on February 10, 2015, that it would not dismiss the charges, I asked my defense counsel, Ira D. London Esq., the following day to move the Manhattan Criminal Court to vacate the ACD before it expired, which he declined to do. *See* Exhibit B, ¶3. At the time, I was seriously traumatized and did not have the wherewithal to retain another defense counsel or move this Court by myself.

### III.    MY ARREST AND PROSECUTION ARE NOT A NULLITY

24.    Pursuant to CPL § 170.55(8), "Upon granting [an ACD], the arrest and prosecution shall be deemed a nullity." As the wording of the ACD statute indicates, the nullity of my arrest and prosecution is a legal fiction and not an actuality. According to CPL § 160.50, the records can still be made available to (ii) a law enforcement agency upon ex parte motion in any superior court, or in any district

court, city court or the criminal court of the city of New York provided that such court sealed the record, if such agency demonstrates to the satisfaction of the court that justice requires that such records be made available to it. Since the records can be made available to a law enforcement agency upon ex parte motion, my arrest and prosecution are not a nullity.

25.     Federal law enforcement agencies do not deem my arrest and prosecution a nullity. Each time I enter the United States, I must go through secondary inspection, which means that I am being detained at the U.S. border on a monthly basis. According to U.S. Customs and Border Control, I will have to go through secondary inspection until I reach the age of 95. I have contacted the office in Albany that is charged with the sealing of criminal records in New York State, and they say that my record is sealed. I have contacted the Department of Homeland Security but they say nothing will change as long as the ACD is not vacated. The record is thus only sealed under New York law, not under U.S. law.

26.     In January 2016, almost a year after my ACD had expired, I had great difficulty renewing my journalist visa even though I had been a legal resident of the United States for 16 years. I never had any difficulty renewing my U.S. visa before. The officers of the U.S. Consulate-General in Amsterdam wanted to see all the documents in the criminal file even though my defense counsel, Ira D. London Esq., affirmed that the arrest and prosecution should be deemed a nullity. Only after

handing all the documents and coming in for an interview with the U.S. consul-general in Amsterdam, I got a new visa but it has a special stamp saying CLASS RECORD REVIEWED – NO INELEGIBILITY REVEALED. This was still under the Obama administration. The new administration may well decide differently.

27.    According to leading legal scholars, the New York ACD can be considered a "conviction" for the purpose of U.S. immigration law. Under the Immigration and Nationality Act (INA) Section 101(a)(48)(A), a conviction occurs when:

1) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt; or,

2) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed. (emphasis added)

28.    While I did not enter a guilty plea, the fact that the Manhattan Criminal Court imposed 12 mandatory therapy sessions can be interpreted as a conviction and an admission of guilt for the purpose of INA Section 101(a)(48)(A)(2). The current administration has already broadened the definition of 'criminal' to include anyone who has been charged with a criminal offense, even if it has not led to a conviction. So far the broadened definition has been used in guidelines that set out which

unauthorized immigrants are a priority for deportation. However, it seems only a matter of time for the broadened definition to be applied to legal immigrants as well.

29.     The ACD is also a conviction and an admission of guilt under 12 U.S.C. § 1829. *See Smith v. Bank of Am. Corp.* (holding that Bank of America in New York correctly withdrew an offer of employment after an FBI-background check revealed that plaintiff had been arrested and charged with petit larceny even though the case had been discontinued by way of an ACD). The fact that CPL § 170.55(8) deems my arrest and prosecution a nullity is immaterial as the ACD is a conviction and an admission of guilt under federal statutes. This Court must ensure my rights both under New York law as well as federal statutes.

## IV.   SUPPRESSION OF MATERIAL EXCULPATORY EVIDENCE

30.     Chief Justice Janet DiFiore introduced a rule requiring judges from January 1, 2018, on to order prosecutors to comb their files and disclose all evidence favorable to the defense at least 30 days before major criminal trials. Prosecutors who ignore the court order may face contempt charges. The suppression of evidence by the prosecution is endemic in New York. A report by the New York Bar Association found that it is among the leading cause of wrongful convictions.

31.     Less than 5 percent of criminal cases proceed to trial. Most cases end in a plea deal. To ensure that justice is also done in cases that end in a plea deal, this Court should not tolerate the suppression of material exculpatory evidence at the

plea-bargaining stage, as happened in my case. If the Court gives the District Attorney's office a pass, prosecutors will know that they can get away with prosecutorial misconduct.

32. During plea discussions, the Manhattan District Attorney's office never disclosed or even mentioned the 1,251 nude photos in the criminal file, which is remarkable because Buiter handed the prosecution hard copies of the photos, making them difficult to overlook given their graphic content. Moreover, I specifically denied on the motion to dismiss that I sent Buiter nude photos of myself.

33. The Manhattan District Attorney's office continued to suppress the material exculpatory evidence even after my counsel sent a letter to District Attorney Cyrus Vance on October 27, 2014, informing him that any nude photos in the criminal file were the product of unlawful surveillance and therefore exculpatory. Instead of handing us the photo files, the Manhattan District Attorney made us file a FOIL-request by which it only complied 11 months later when the ACD had expired, and my case was dismissed. District Attorney Cyrus Vance thus willfully suppressed evidence that is material to my guilt or innocence or punishment. The prosecution's obligation to disclose *Brady* evidence does not end with the adjournment of a case in contemplation of dismissal. *See People v. Wilson*, NY Slip Op 02106 (4th Dept., 2018) (rejecting the People's contention that the defendant forfeited his right to raise the alleged *Brady* violation by pleading guilty).

## V.      I AM WILLING TO WAIVE MALICIOUS PROSECUTION CLAIM

34.     If necessary, I am willing to waive any malicious prosecution claim that may arise. I have applied for the LL.M. program at several law schools (Harvard, Yale, Columbia, and NYU). If the ACD is vacated and the charges dismissed pursuant to CPL § 210.40, I can begin with a clean slate.

## VI.     CONCLUSION

35.     The ACD was obtained in violation of my rights as a defendant under the Constitution of the State of New York and the Constitution of the United States. Not only did the Manhattan District Attorney's office suppressed material exculpatory evidence that goes to my guilt or innocence or punishment, but my defense counsel failed to move the Manhattan Criminal Court timely to vacate the ACD despite my request.

36.     The ACD was designed to provide a shield against the criminal stigma that would otherwise attach to a defendant. The ACD is not a rug for the Manhattan District Attorney's office to swipe its prosecutorial lapses and misconduct under.

WHEREFORE, for the foregoing reasons, I respectfully submit that my motion for leave to appeal is granted and the Court issues any other relief it deems just and equitable.

Signature

HELEEN MEES
THE SWEENEY BUILDING
30 Main Street, Apt. 11H
Brooklyn, New York 11201
(917) 325-5877

*Defendant Pro Se*

Sworn to before me this      day of February, 2019

TO:   Manhattan District Attorney's office